(No. 78313.—

ANDREW C. SWICK *et al.*, Appellees, v. JAMES LI-
AUTAUD *et al.*, Appellants.

*Opinion filed January 18, 1996.—Rehearing denied April 1, 1996.*

506

HARRISON, J., took no part.
McMORROW, J., specially concurring.

Kimball R. Anderson, Christopher S. Canning and David E. Koropp, of Winston & Strawn, of Chicago, for appellants.

Brady, McQueen, Martin, Collins & Jensen (Alfred Y. Kirkland, Jr., of counsel), and Willard B. Widerberg, all of Elgin, for appellees.

Amy L. Silvestri, of Rockford, for *amicus curiae* Illinois Trial Lawyers Association.

James L. Donnelly and Marc A. Primack, of Rooks, Pitts & Poust, of Chicago, for *amicus curiae* Illinois Manufacturers' Association.

JUSTICE HEIPLE delivered the opinion of the court:

Plaintiffs, Andrew Swick and Dianne Swick, brought an action in the circuit court of Kane County against Gabriel, Inc., Capsonic Group, James Liautaud and Prabhudas Patel alleging malicious prosecution, interference with prospective advantage, interference with lawful competition through malicious intimidation, false light, libel, and intentional infliction of emotional distress. The trial court granted defendants directed verdicts on the interference with prospective advantage, interference with lawful competition and false light counts. The jury returned a verdict in favor of Swick on the malicious prosecution count and awarded Swick punitive damages. The jury found in favor of defendants on the libel and intentional infliction of emotional distress counts. The appellate court affirmed the jury verdict and the directed verdicts. (No. 1—93—1099 (unpublished order under Supreme Court Rule 23).) We granted defendants' petition for leave to appeal (145 Ill. 2d R. 315).

## BACKGROUND

The following facts are not in dispute. Swick became an employee of Capsonic in 1985. Gabriel is the parent company of Capsonic. Liautaud is the sole owner and chairman of Gabriel and Patel is president of Capsonic. When Swick began his employment with Capsonic, he signed a document which acknowledged that Capsonic owned proprietary information and which confirmed

that this information would be kept confidential. The document further stated that if at any time Swick left Capsonic, Swick would deliver to Capsonic any Capsonic documents and drawings in his possession and that Swick could not enter into direct competition with Capsonic for a period of two years.

In October 1988, Swick accepted a position with Altair/Augat, a competitor of Capsonic. On November 5, 1988, prior to leaving Capsonic and prior to telling Liautaud or Patel of his new position, Swick photographed machinery at the firm. At this time, Swick also had Capsonic parts, designs and documents in his personal possession outside of Capsonic offices. When approached about the photographs, parts, designs and documents, Swick agreed to return them to Capsonic.

On November 9, Swick returned the photographs to Capsonic, but he kept a second set for himself. Swick did not return the parts, designs and documents at this time. During several meetings between Swick, Patel and Liautaud, Swick denied having accepted another position.

On November 10, Patel contacted the Elgin police department regarding the materials in Swick's possession. That day a trial court issued a search warrant for Swick's home and the warrant was executed in the evening. The police found blueprints, drawings, and parts pertaining to Capsonic machinery and materials in Swick's home. The police were unable to recover all of the documents, which Swick later destroyed.

Several days later, the State's Attorney charged Swick with theft of property over $300. On January 3, 1989, Swick began work at Altair. On January 23, 1989, the criminal charges against Swick were nol-prossed. In

March of 1991, Swick filed a multicount complaint against Gabriel, Capsonic, Liautaud and Patel.[1]

At trial, the parties offered different versions of the facts. Swick claimed that after the police searched his home, he met with Liautaud and Patel. Swick told them that he had accepted another job. Swick alleged that Liautaud then threatened him and Liautaud said that Swick would never work in the industry again, that Swick would not be able to get a job, and that Swick's name would be in the press. Swick claimed that Liautaud was angry at him for taking another job. Swick stated that in retaliation for his accepting the job with Altair, Liautaud and Patel ordered that the police search his home and demanded that the State's Attorney pursue the theft charge. Swick also stated that Liautaud forced him to sign a confession of sorts, wherein he stated that he took the photographs without authorization, while knowing that the equipment he was photographing represented trade secrets and intellectual property.

Swick also claimed that he had told several of his co-workers of his job with Altair and that they did not see any problems with his continuing to work at Capsonic while waiting for the new job at Altair. Swick further testified that there was not a company policy or rule which prevented him from taking the pictures and, in any event, the pictures were worthless. Swick stated that employees routinely took home drawings and other documents. There was no company procedure to keep track of who had which documents.

The defendants argued that the materials recovered from Swick's home had a significant monetary value and related directly to Capsonic's proprietary designs

---

[1]Patel's allegations of trial court error are not before this court. Gabriel, Capsonic and Liautaud will be referred to as "defendants" throughout the opinion.

and manufacturing processes. Liautaud claimed that if a competitor gained access to the materials, Capsonic could lose over a million dollars. The defendants argued that they feared that Swick would reveal Capsonic secrets to Altair if they did not obtain the photos, documents and parts.

Lieutenant Carl Olsen of the Elgin police department, who investigated the allegations made by Patel and Liautaud, also testified at trial. Olsen testified that the State's Attorney contacted him to determine if he objected to the entry of the *nolle prosequi*. Olsen also stated that a *nolle prosequi* is a voluntary dismissal which allows the State's Attorney to reopen the case at a later time, but it is not a finding that the defendant is either guilty or not guilty. Olsen did not state the reasons for the *nolle prosequi*. The court order nol-prossing the criminal charges was entered into evidence, but neither party provided any additional evidence as to why the order was entered.

At the close of evidence, the trial court granted a directed verdict in favor of defendants on all counts of Swick's complaint except those alleging libel and intentional infliction of emotional distress. The court determined that Swick failed to prove an essential element of the malicious prosecution count, namely, that the underlying criminal charge was terminated in a manner favorable to Swick, and that a directed verdict in favor of defendants was proper. The court noted that it had heard no evidence on why the *nolle prosequi* was entered. However, prior to the start of jury deliberations and upon Swick's motion for reconsideration, the trial court changed its decision regarding the malicious prosecution count and found that the jury could consider this claim. The jury instructions read that "A *nolle prosequi* dismissal of a criminal proceeding is a termination in favor of the plaintiff."

The jury returned a verdict in favor of Swick on the malicious prosecution count and awarded Swick $5,000 in compensatory damages. The jury further assessed punitive damages against Liautaud in the amount of $400,000 and against Gabriel, including Capsonic, in the amount of $250,000. The defendants requested both a judgment notwithstanding the verdict and a new trial on the malicious prosecution claim. The trial court denied both requests.

The jury found against Swick and in favor of the defendants on the libel and intentional infliction of emotional distress counts. Further, the jury found in favor of the defendants on all counts involving Dianne Swick.

The appellate court affirmed. The court stated that by presenting the *nolle prosequi* order, Swick "offered sufficient evidence from which a jury could conclude that the theft case was terminated in his favor." The court also approved the jury instruction on the effect of a *nolle prosequi*. Finally, the court rejected Swick's cross-appeal, which claimed error in the grant of the directed verdicts and in the exclusion of certain evidence.

On appeal to this court, defendants argue that: (1) Swick failed to satisfy his burden of proof on the malicious prosecution count, in that bare evidence of the *nolle prosequi* did not establish that the underlying criminal proceeding was terminated in Swick's favor; (2) the trial court erred in giving the limited instruction on the effect of a *nolle prosequi*; (3) the punitive damages award was excessive, duplicative and in violation of their rights; and (4) Swick failed to prove compensable damages. Swick has filed a cross-appeal in which he claims that the trial court erred in granting directed verdicts on the invasion of privacy, interference with prospective advantage and interference with lawful com-

petition counts and in excluding evidence in support of the libel and intentional infliction of emotional distress counts.

## MALICIOUS PROSECUTION ACTION

Defendants contend that the bare offering of the *nolle prosequi* order, without any additional testimony as to why the order was entered, did not establish that the criminal proceedings were terminated in Swick's favor. Defendants note that Swick alleged in his complaint that the criminal charges were nol-prossed because of the "absence of any showing of evidence indicating Swick's guilt." Defendants argue that since Swick did not offer evidence of the State's Attorney's reasons for the *nolle prosequi*, Swick failed to establish an essential element of his malicious prosecution claim.

In order to establish a malicious prosecution action, the plaintiff must allege facts showing: " '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.' " (*Joiner v. Benton Community Bank* (1980), 82 Ill. 2d 40, 45, quoting *Ritchey v. Maksin* (1978), 71 Ill. 2d 470, 475.) The absence of any one of these elements bars a plaintiff from pursuing the claim. (*Joiner*, 82 Ill. 2d at 45; see *Misselhorn v. Doyle* (1994), 257 Ill. App. 3d 983, 986.) In regard to the second element, a malicious prosecution action cannot be predicated on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused. *Joiner*, 82 Ill. 2d at 45.

Whether the nol-pros of a criminal charge constitutes a favorable termination in a malicious prosecution action is a question of first impression before this court. In a criminal context, a *nolle prosequi* "is not a final dis-

position of a case but *** is a procedure which reverts the matter to the same condition which existed before the commencement of the prosecution." (*People v. Woolsey* (1990), 139 Ill. 2d 157, 163.) In the civil malicious prosecution context, the majority rule is that a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi,* unless the abandonment is for reasons not indicative of the innocence of the accused. (Restatement (Second) of Torts §§ 659, 660, 661 (1977); *McKenney v. Jack Eckerd Co.* (1991), 304 S.C. 21, 22, 402 S.E.2d 887, 888; *Wynne v. Rosen* (1984), 391 Mass. 797, 464 N.E.2d 1348.) The abandonment of the proceedings is not indicative of the innocence of the accused when the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial. (Restatement (Second) of Torts §§ 660, 661 (1977).) We find that the majority rule best reflects the need to balance an individual's right to be free from unreasonable criminal prosecutions with the public policy which favors the exposure of crime. (See *Joiner,* 82 Ill. 2d at 44 ("[p]ersons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by the fear of unfounded suits by those accused").) Accordingly, we adopt this rule.

The burden of proof of a favorable termination, however, remains with the plaintiff. (See Restatement (Second) of Torts § 672 (1977).) Only when a plaintiff establishes that the *nolle prosequi* was entered for reasons consistent with his innocence does the plaintiff meet his burden of proof. The circumstances surround-

ing the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution. (*Wynne*, 391 Mass. at 800-01, 464 N.E.2d at 1350-51.) Otherwise, every time criminal charges are nol-prossed a civil malicious prosecution action could result.

In the instant cause, Swick alleged in his complaint that the *nolle prosequi* was entered because of a lack of evidence showing his guilt. In their answer to the complaint, the defendants denied this allegation. The *nolle prosequi* order did not reflect the reasons for its entry. The order simply stated, "m/s nolle pros per Gary Johnson instructions recall warrants" and was signed by the trial judge. Although Lieutenant Olsen testified regarding the *nolle prosequi*, he did not state the reasons behind its entry.

Because of the lack of evidence at trial regarding the reasons for the entry of the *nolle prosequi*, we find that Swick has failed to meet his burden of proof of a favorable termination. Swick has not provided any evidence of the reason for the entry of the *nolle prosequi*. The bare use of the *nolle prosequi* order, which did not state its reasons for its entry, did not establish that the criminal proceedings were terminated in a manner consistent with Swick's innocence. Swick did not prove that the State lacked reasonable grounds to pursue the criminal charges. Outside the presence of the jury, Swick's counsel even admitted that he did not provide evidence of the State's Attorney's reasons for the entry of the *nolle prosequi*. Further, the trial judge stated that he had not heard anything to explain why the charges were nol-prossed. Therefore, the jury was improperly instructed that "[a] *nolle prosequi* dismissal of a criminal proceeding is a termination in favor of the plaintiff."

Although it may appear that defendants have the right to a judgment notwithstanding the verdict, as

Swick did not establish an element of the cause of action, fairness requires that Swick be given the opportunity to provide evidence of the reasons for the entry of the *nolle prosequi*. This court has clarified a plaintiff's burden of proof in a malicious prosecution action and decided an issue of first impression whose resolution was not clearly foreshadowed. Fairness requires that Swick be given the opportunity to prove that the *nolle prosequi* order was entered in a manner indicative of his innocence. Thus, we remand this cause to the trial court for a new trial on the malicious prosecution count.

Since we remand for a new trial, we decline to consider the defendants' allegations concerning the award of punitive damages and whether Swick proved compensable damages.

## SWICK'S CROSS-APPEAL

### I. Invasion of Privacy

Swick contends that the trial court improperly granted defendants' motion for a directed verdict on the invasion of privacy, false light, count (count V). The trial court granted the directed verdict after finding that Liautaud's statements on which Swick originally based his claim, Exhibit 12 and two newspaper articles, were not defamatory *per se*.[2] Since Swick was required

---

[2] Swick's original complaint alleged invasion of privacy and libel based on Exhibit 12. Defendants filed a motion to dismiss the counts. The trial court determined that Exhibit 12 was not defamatory *per se*, and since Swick failed to allege extrinsic circumstances or special damages, Exhibit 12 could not be used in support of either count. The trial court did allow Swick leave to amend. Swick filed an amended complaint in which he maintained counts for invasion of privacy and libel, but eliminated specific reference to Exhibit 12. In his amended complaint, Swick did allege that defendants made communications to the local news media and made other public statements regarding the occurrences at Capsonic. Swick continually moved to bring Exhibit 12

to, but did not, plead and prove special damages and extrinsic circumstances, the trial court found that Swick failed to establish all the elements of a false light claim and that defendants were entitled to a directed verdict.

Swick, relying on *Kolegas v. Heftel Broadcasting Corp.* (1992), 154 Ill. 2d 1, 17, now argues that to establish a cause of action for false light, he was only required to plead and prove that (1) he was placed in a false light before the public as a result of the defendants' actions, (2) the false light in which he was placed would be highly offensive to a reasonable person and (3) defendants acted with actual malice. Swick asserts that a false light cause of action does not incorporate concepts of *per se* and *per quod* and does not require proof of extrinsic circumstances or special damages. Swick further contends that the statements in Exhibit 12 are defamatory *per se* and that he is entitled to a new trial on the false light count.

Exhibit 12 is a statement of facts prepared by Capsonic in response to the circumstances surrounding Swick's employment and the taking of the photographs. The beginning of Exhibit 12 tells of Swick's initial employment with Capsonic, Capsonic's business and manufacturing operations, and Swick's duties. The exhibit then states:

> "Following approximately two weeks of Mr. Swick's acceptance of his employment offer from Altair, Mr. Swick removed from the premises a detailed blueprint, physically identified as a Capsonic proprietary design and so marked, that detailed the complete layout and method of manufacture of this new Ford TFI Housing automated manufacturing system.
>
> On Saturday, 5 November 1988, with most of the employees gone, Mr. Swick was observed to have photo-

---

back into the false light and libel counts. The trial court denied these motions, stating that defendants would be prejudiced by the use of Exhibit 12.

graphed, with his camera and film, Capsonic's entire plant, including the complete automated systems currently in production.

On Wednesday, 9 November 1988, Andy Swick signed a document stating that he, without authorization from any officer or superior, and without informing any of the above, took a series of photographs of this proprietary equipment, automated devices, proprietary molds, fixtures and other such manufacturing devices that are the property of Capsonic and are guarded at the factory with a security system to maintain its propriety, acknowledging that this was in violation of the security rules of the Company.

On Wednesday, 9 November 1988, Mr. Swick denied he had accepted employment with any other competitor, and specifically with Altair.

On Thursday, 10 November 1988, a search warrant was issued, and executed by the Elgin Police Department, under the direction of Sergeant Olsen, and evidence was taken from the home of Mr. Swick that included 39 confidential Capsonic documents revealing detailed automated designs, any of which could cause great harm to Capsonic if known by Capsonic's competitors. ***

On 11 November 1988, Mr. Swick admitted to accepting employment by Altair, division of Augat, Inc."

At trial, Liautaud admitted giving a copy of Exhibit 12 to the news media. Exhibit 12 was admitted into evidence and the jury was read portions of Exhibit 12. The two newspaper articles recount that Swick had been arrested and charged with theft for stealing company secrets and that Capsonic was pursuing a civil action against Swick. Swick contends that the underlying basis for the two articles was Exhibit 12.

Illinois courts have recognized four types of *per se* defamation: (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute the inability to perform or want of integrity in the discharge of duties or office or employment; or (4) words

that prejudice a party, or impute a lack of ability, in his trade, profession or business. (*Kolegas*, 154 Ill. 2d at 10; *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 238-39.) Even if words fall into one of these four categories, the words are not defamatory *per se* if they are reasonably capable of an innocent construction. (*Kolegas*, 154 Ill. 2d at 11.) When words are defamatory *per se*, they are considered to be so obviously and naturally harmful to the plaintiff that the plaintiff need not plead and prove special damages. (*Mittelman*, 135 Ill. 2d at 235.) Each case must be decided on its own facts, as there is no clear rule for determining whether language is defamatory. *Rosner v. Field Enterprises, Inc.* (1990), 205 Ill. App. 3d 769, 789.

In the instant cause, the statements in Exhibit 12 could be found to be defamatory *per se*. The statements impute a want of Swick's integrity in the discharge of his duties at Capsonic. The statement accuses Swick of being an industrial spy, lying, stealing and attempting to deceive Capsonic's management. Further, the words are not susceptible to an innocent construction. Exhibit 12 goes straight to the core of Swick's honesty and integrity while employed at Capsonic. As Exhibit 12 can be interpreted as defamatory *per se*, the trial court's reasons for originally granting the motion to dismiss were improper. Swick should have been allowed to pursue a false light cause of action on the basis of Exhibit 12.

Regarding the two newspaper articles, the articles appear to be a report of the criminal charges and civil lawsuit against Swick. However, the articles were not actually authored by Liautaud or Capsonic. There is little, if any, evidence in the record concerning whether Exhibit 12 is the basis for the articles and, if so, whether Exhibit 12 and the articles placed Swick in a false light before the public. Accordingly, this court cannot determine whether Swick has alleged or proven suf-

ficient facts to establish the essential elements of a false light cause of action as developed in *Kolegas*. (See *Kolegas*, 154 Ill. 2d at 17-18.) Thus, we remand the false light count for further proceedings consistent with this opinion.

## II. Libel

Swick claims that the trial court erred in refusing to receive Exhibit 12 and the two newspaper articles as evidence in support of the libel count (count III) and that he should now be granted a new trial on this count. As outlined above, Swick attached Exhibit 12 and the newspaper articles to his original complaint, but the trial court excluded Exhibit 12 as it was not defamatory *per se*. The trial court later granted the defendants partial summary judgment on the libel count, finding that the two newspaper articles were not defamatory and could not be used in support of the count.

In light of the conclusions reached regarding the false light count, Swick should have been allowed to use Exhibit 12 to pursue his claim of libel. Accordingly, we remand the libel count for further proceedings consistent with this opinion.

## III. Interference with Prospective Advantage

Swick argues that the trial court erred in granting defendant's motion for a directed verdict on the interference with prospective advantage count (count IV). In the complaint, Swick alleged that defendants' actions delayed his acceptance of employment with Altair, resulting in lost wages, and prevented him from marketing his services to other companies. The trial court granted a directed verdict for defendants on this count, finding that Swick had not proven damages.

Swick now claims that the evidence presented at trial established that his employment at Altair was delayed and that he was hired at lower reporting level

after Liautaud accused him of theft. A review of the record indicates that defendants' actions did not interfere with Swick's entering into a business relationship with Altair. Swick started work with Altair on the agreed date and at the agreed salary. The trial court properly directed a verdict for defendants.

#### IV. Interference with Lawful Competition

Swick's next claim is that the trial court erred in granting defendants' motion for a directed verdict on count XI of the complaint, since he provided evidence of a civil conspiracy between Liautaud and Patel to initiate criminal proceedings. Swick titled this count "Interference with lawful competition through malicious intimidation" and re-alleged prior paragraphs of his complaint. The trial court found that count XI was the same as the count for interference with prospective advantage and granted a directed verdict.

The record reflects that the trial court properly granted the defendants' motion for a directed verdict as count XI incorporated all prior counts and did not raise any new allegations. The only difference between this count and the other counts of the complaint was its title. This count was merely duplicative of other counts.

#### V. Intentional Infliction of Emotional Distress

Swick argues that the trial court erred in excluding evidence of the reasonableness of his apprehension of and suffering from Liautaud's conduct in support of his claim for intentional infliction of emotional distress. Swick wanted to admit evidence of Liautaud's intimidating and harassing conduct toward former employees, competitors and public officials to show why he believed that Liautaud's threats toward him were not "idle threats" and why these threats caused him emotional suffering. The trial court granted a defense motion *in*

*limine* which sought to exclude this evidence.[3] In support of his current contention, Swick relies on *McGrath v. Fahey* (1988), 126 Ill. 2d 78, 88, where this court stated that "when threats of improper use of power or authority form the crux of an action for emotional distress, it should appear that the plaintiff reasonably believed that those threats would be carried out."

A trial judge has discretion in granting a motion *in limine* and a reviewing court will not reverse a trial court's order allowing or excluding evidence unless that discretion was clearly abused. (See *Sher v. Deane H. Tank, Inc.* (1995), 269 Ill. App. 3d 312, 317.) A review of the record indicates that the trial judge did not abuse his discretion in granting the defendants' motion *in limine*. The evidence which Swick wanted to admit did not directly involve Liautaud's conduct toward Swick and did not connect Liautaud to Swick in any manner. The evidence involved Liautaud's actions toward separate, unrelated individuals. Swick does not claim that Liautaud told him of this conduct or that Liautaud used this conduct to directly threaten or intimidate him. Since the evidence does not have any direct relationship to Swick, the trial judge did not abuse his discretion.

For the above-stated reasons, we reverse in part and affirm in part the judgments of the appellate and circuit courts, and remand this cause to the circuit court for further proceedings consistent with this opinion.

*Appellate court judgment affirmed in part and reversed in part;*

---

[3]In his brief before this court, Swick fails to provide a citation to the report of proceedings or common law record where the trial court judge excluded this evidence or stated the reasons for exclusion. However, an extensive review of the record indicates that the trial court granted a defense motion *in limine* to exclude the evidence. Thus, Swick's challenge is to the granting of the motion *in limine*, although the challenge is not raised as such in his brief.

*circuit court judgment affirmed in part*
*and reversed in part;*
*cause remanded.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

JUSTICE McMORROW, specially concurring:

I agree with the majority on the *nolle prosequi* issue presented in this appeal. In view of the disposition of the case,. it would be premature at this time to decide whether the award of punitive damages was excessive. However, because the issue was raised in the briefs, and in the interests of guidance for and fairness to the parties, I believe we should address the general question of whether punitive damages may be recovered in a malicious prosecution case.

In jurisdictions which recognize punitive damages, the general rule has long been that such damages are available in malicious prosecutions cases. (See, *e.g.*, *Donnell v. Jones* (1848), 13 Ala. 490; *Davis v. Seeley* (1894), 91 Iowa 583, 60 N.W. 183; *Sperier v. Ott* (1906), 116 La. 1087, 41 So. 323; *Jackson v. American Telephone and Telegraph Co.* (1905), 139 N.C. 347, 51 S.E. 1015; *Kraft v. Montgomery Ward & Co.* (1959), 220 Or. 230, 348 P.2d 239; *Barnett v. Reed* (1865), 51 Pa. 190; *Rice v. Miller* (1888), 70 Tex. 613, 8 S.W. 317; *McIntosh v. Wales* (1913), 21 Wyo. 397, 134 P. 274. See also Restatement (Second) of Torts § 673, Comment *k* (1976) ("Because of the nature of the tort itself, punitive damages are always possible in actions for malicious prosecution").) In Illinois, with the exception of cases arising in response to medical malpractice litigation (735 ILCS 5/2—109 (West 1994)), punitive damages have been available in malicious prosecution actions for at least 125 years. *Lawrence v. Hagerman* (1870), 56 Ill. 68, 76 (noting, even then, that the rule was "well established").

Notwithstanding this weight of authority, defendants argue that, as a matter of sound public policy, punitive damages should not be available in actions for malicious prosecution. In support of their contention, defendants argue by way of analogy to the tort of intentional infliction of emotional distress. Defendants maintain that, just as punitive damages are not permissible in an action for intentional infliction of emotional distress, they also should be unavailable in an action for malicious prosecution.

In *Knierim v. Izzo* (1961), 22 Ill. 2d 73, this court recognized the tort of intentional infliction of emotional distress. This court also stated that "punitive damages cannot be sanctioned as an additional recovery in such an action. Since the outrageous quality of the defendant's conduct forms the basis of the action, the rendition of compensatory damages will be sufficiently punitive." (*Knierim*, 22 Ill. 2d at 88.) This principle has been further explained: "Some intentional torts are defined in terms of outrageous conduct, with the minimum required to state a cause of action under the tort so high that, once the elements of the action are there, no room remains for conduct that exceeds, that is more wanton and malicious, than that which defines the underlying tort." (*Lynch v. Mid-America Fire & Marine Insurance Co.* (1981), 94 Ill. App. 3d 21, 32 (Craven, J., concurring in part & dissenting in part).) Defendants contend that malicious prosecution is such a tort and that, therefore, punitive damages should be unavailable.

I am not persuaded that this position should be adopted. Malicious prosecution is not analogous to intentional infliction of emotional distress. By definition, conduct sufficient to support a cause of action for intentional infliction of emotional distress will always support an award of punitive damages. The same is not true in a malicious prosecution case: a defendant's

conduct may be sufficiently malicious to support the underlying cause of action without necessarily being sufficient to support an award of punitive damages. (See generally Annot., *Defendant's State of Mind Necessary or Sufficient to Warrant Award of Punitive Damages in Action for Malicious Prosecution*, 94 A.L.R.3d 791 (1979).) As this court has noted, "[m]alice, as an element of malicious prosecution, does not necessarily mean personal ill-will, spite or hatred toward the person prosecuted, but is proved by showing that the prosecutor was actuated by improper motives." (*Glenn v. Lawrence* (1917), 280 Ill. 581, 586.) Because there is a degree of malicious conduct, *i.e.*, ill-will, spite or hatred, which exceeds that defining the underlying tort, the concern animating the restriction on punitive damages for the tort of intentional infliction of emotional distress is not present here. Thus, there is no reason to conclude, as a matter of law, that punitive damages should not be available in a malicious prosecution case.

This conclusion does not, however, complete the discussion regarding punitive damages and malicious prosecution. Important issues remain concerning the degree of malice necessary to establish liability for malicious prosecution and the degree of malice necessary to sustain an award of punitive damages. (See, *e.g.*, *Burnett v. Griffith* (Mo. 1989), 769 S.W.2d 780; *Sanders v. Daniel International Corp.* (Mo. 1984), 682 S.W.2d 803; *Adams v. Whitfield* (Fla. 1974), 290 So. 2d 49.) A satisfactory analysis of these issues necessarily involves a detailed discussion of the facts of this case and is beyond the scope of this brief concurrence. For the time being, I simply note my concern with these issues and my belief that they merit serious discussion.