Ronald R. POPE and Serendipity: Russian Consulting & Development, Ltd., Plaintiffs–Appellants,

v.

The CHRONICLE PUBLISHING COMPANY, d/b/a "The Pantagraph," Defendant–Appellee.

No. 95–2204.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1996.

Decided Sept. 10, 1996.

610

George F. Taseff (argued), Peoria, IL, for plaintiffs–appellants.

Mark Sableman (argued), Thompson Coburn, St. Louis, MO, Thomas N. Jacob, Bloomington, IL, for defendant–appellee.

Before KANNE, ROVNER, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

With the best of intentions, Ronald Pope embarked on a mission to assist the former Soviet Union in its difficult transition from a planned economy to a market economy. He formed a corporation, Serendipity: Russian Consulting & Development, Ltd. ("Serendipity"), that would, through a combination of philanthropy and old-fashioned Yankee entrepreneurialism, begin these efforts with the construction of the "First American Home in Russia." The house was built (complete, we are interested to see, with two-car garage, three bedrooms, two baths, and a patio with built-in barbecue pit), but it turned out that some of the Russian recipients were not as grateful as they might have been. When the local newspaper in Pope's home of Bloomington–Normal, Illinois, the *Pantagraph*, published first an article and then an editorial reporting on the Russian criticism, Pope was not pleased. This lawsuit resulted, claiming that the Chronicle Publishing Company (a Nevada corporation with its principal place of business in California), which owned the *Pantagraph*, defamed him and his company and cast him in a false light on both occasions. Pope appeals from the district court's decision granting summary judgment for the defendants on all counts.

I

Pope is an associate professor in the Department of Political Science at Illinois State University, where he teaches courses in Soviet/Russian politics and foreign policy. In April 1989, he served as one of the interpreters for a delegation of officials from Vladimir, Russia, who were visiting Bloomington–Normal to inaugurate a Sister City relationship between the two cities. He paid a visit to Vladimir in mid–1990 and returned home inspired to try to make a difference in the great transition that even then was underway. He believed that the Russians needed exposure to a profit-oriented business that would help them improve the efficiency of their economy, but he knew that from the American side the risks of undertaking new investment in Russia were huge.

The solution to this dilemma, in Pope's eyes, was to expose the Russians to the real operations of an American-style business enterprise. He formed Serendipity to be a vehicle to do just that. Pope and some colleagues, with the encouragement of the mayor of Vladimir, I.V. Shamov, decided to construct the First American Home in (post-Communist) Russia. The project was to be a joint venture, for which Vladimir would supply land, pour the foundation, and provide room and board for visiting construction crews, and Serendipity would supply materials and construction expertise. Homebuilders from the Bloomington–Normal area were prepared to supply free labor. During a spring 1991 visit to Vladimir, Pope was interviewed by one Svetlana Bitkina, a reporter for the *Vladimirskie Vedomosti*, a local newspaper. Bitkina published an article in the *Vedomosti* on June 21, 1991, that was quite positive about the project and about Pope.

During the time the project was being developed, Pope and others visited Vladimir on several more occasions. In September 1991, he went under the sponsorship of the Vladimir City Executive Committee, which was the sponsor for his Russian joint venture partner. He returned in December 1991 to discuss technical details and to obtain approval of a new site, which the City's chief architect had chosen for the home. According to Pope, whose account we accept on this appeal from an adverse summary judgment, his Russian partner INCOM paid for the American group's food, lodging, and transportation expenses, in exchange for a laptop

computer that Pope gave to them, which was valuable enough to cover all of the American group's costs. At the end of the trip, on January 2, 1992, Pope (for Serendipity) and the Vladimir City officials signed an agreement for the project. The City government was to cover all expenses on the Russian side, while Serendipity would furnish materials (except for concrete) and a workforce. At the end, the house was to be jointly used by the City and Serendipity for a period of two years and then turned over to the City's complete control.

Early 1992, however, was a time of steep inflation in Russia, and the project soon developed financial problems on the Russian side. Pope thought it was critically important to follow through with the deal, notwithstanding these problems, and he wanted to do it sooner rather than later, because he feared losing claim to having the "first" American home in Russia. On February 4, 1992, Pope received a telex from Igor Eremeev, the head of the Vladimir Department for International Contacts and Sister City Relations. Eremeev warned that the City might not be able to cover its share of the expenses, and he requested in vague terms additional information on the project. Pope responded on February 5 with his own request for clarification about what information was desired, and he assured Eremeev that Serendipity would find a way to cover any expenses that the Russian side could not afford. Pope suggested that Serendipity would be willing to provide additional financial support, in exchange for fuller use of the house for a longer time period, and he warned that "failure to build this house within the stated deadline will send a very strong message to both American businessmen and tourists that Vladimir is not a good place for joint work or for visits."

Eremeev replied with another telex, dated February 24, 1992, again asking for more information and again failing to specify exactly what he wanted. He also asked Pope to keep a certain "third party" from interfering with the project, which Pope interpreted as a reference to his sole Russian representative. Pope sent another telex on February 25, telling Eremeev that he would be arriving in Vladimir on March 7, 1992, to discuss the project, again reassuring Eremeev that Serendipity would cover the expenses in exchange for greater use of the house, and again warning of adverse consequences if the project fell through. Eremeev fired off one more telex on February 27, this time tipping his hand: he wanted Serendipity to supply detailed information about the more than fifty companies participating in the project, and he wanted detailed cost information about every item the American side intended to use in the project. Pope regarded these requests as out of line. Soon after he received that telex, he received word from a German official who had contacts with Vladimir that Eremeev was a former KGB officer who could not be trusted.

During meetings from March 7 to 15 in Vladimir, Pope reiterated his suggested solution to the Russian financial problems. Mayor Shamov accepted Pope's offer and agreed to allow Serendipity to have exclusive use and possession of the property until January 1, 2003. Shortly after these meetings, the *Vedomosti* published two articles about the project, both written by Bitkina. In these articles, Bitkina questioned Pope's and Serendipity's motives and raised doubts about the benefits the project would have for the City. The first article, as the paper noted, had been written before the March meetings had taken place. Another article, written by Serendipity's Russian representative Tanya Veksler, appeared in the April 9–10 issue of *Molva*, another newspaper in Vladimir sponsored by the City Council. Bitkina responded with an article of April 15, 1992, in which she reiterated her criticisms of the project and did not retract her objection to the financing arrangements.

Construction on the house actually began in May 1992, even though the final agreement was not signed until July 3, 1992. In the meantime, however, the *Pantagraph* had gotten wind of the local criticism in Vladimir. On July 5, 1992, ironically while Pope himself was in Vladimir for the dedication of the house, the *Pantagraph* published the first article at issue here. The headline read "Vladimir newspaper questions Pope's project." The article began by stating that the

project "has been plagued by cross-cultural misunderstanding and poor communication, according to articles in a Vladimir newspaper." It noted that at least one other Vladimir newspaper had given the project positive coverage, and it then summarized Bitkina's articles. Specifically, the article noted that Bitkina had raised questions about the costs and benefits of the house, the motives behind the project, and the manner in which it had been carried out. The articles, the *Pantagraph* reported, had objected to the characterization of the house as "humanitarian aid," if in fact it was really going to further American business interests. The *Pantagraph* also reported on the exchange of telexes between Pope and Eremeev. Bitkina's articles had portrayed the project as somewhat shameful to the Russians, who did not like being treated "without care" by the wealthy foreigners. Next, the *Pantagraph* article presented Pope's perspective from earlier articles and interviews. It did not, nor did it purport to, call him or his wife for comment. Finally, the article reported that Bitkina had questioned the December 1991 trip that she claimed cost the City Council 40,000 rubles, and concluded with her question: "what exactly does the city get out of this project?"

The *Pantagraph* followed up with an editorial on July 14, 1992, entitled "Let's avoid looking like 'ugly Americans.'" The editorial opined that it was not surprising that Russian newspaper stories about the Serendipity project reflected a cool local reception, since many Americans might react the same way if the shoe were on the other foot. It called Pope's idea a "worthy one," but it said that "the laudable goal was clouded by questions about business motives behind the project and whether Vladimir could afford its share of the project with its economy in disarray." Finally, it criticized Pope for warning the Vladimir officials that delaying the project would send a negative message about Vladimir as a City for business or tourism. "Those kinds of comments," it concluded, "risk creating the appearance of 'ugly Americans' throwing their weight around.... We should be forging relationships, not creating suspicions."

## II

On May 3, 1993, Pope and Serendipity (collectively, Pope) filed a four-count diversity suit in federal court against the *Pantagraph's* publisher, Chronicle. Counts I and III charged Chronicle with defamation and casting the plaintiffs in a false light by publishing the July 5, 1992, article, and Counts II and IV made the same charges about the July 14, 1992, editorial. (Serendipity later conceded that under Illinois law a corporation cannot assert a false light claim, see *Pope v. Chronicle Publishing Co., d/b/a "the Pantagraph,"* 891 F.Supp. 469, 473 n. 4 (C.D.Ill.1995), so we treat both false light counts as asserted only on behalf of Pope personally.) The district court, in a careful opinion, granted summary judgment for the Chronicle. *Id.*

Pope's complaints about the article focused on four points: (1) it falsely stated that he had promoted the project as humanitarian aid, whereas it was being carried on to further the interests of American business; (2) it falsely stated that Pope misled or withheld information from Vladimir officials and forced the project on the city; (3) it falsely stated that Pope was representing himself as some kind of benefactor for the residents of Vladimir; and (4) it falsely stated that the project, and in particular the December 1991 trip, cost the Russians a significant amount of money. The editorial had similar flaws: (1) it falsely stated that Pope kept the title to the house; (2) it falsely stated that Pope misled or withheld information from Vladimir officials about the cost of the project; (3) it "falsely and without motive" impugned Pope's business motives; (4) it falsely accused Pope of being an ugly American; and (5) it falsely accused him of creating suspicions and not "forging relationships" with Vladimir. After a careful analysis of the Illinois law of defamation and false light, which both parties agree applies here, the court found that the undisputed facts showed that neither the article nor the editorial was defamatory per se and neither one cast Pope in false light.

## III

■ Under Illinois law, someone who publishes a defamatory statement made by an-

other remains subject to liability even though the publisher clearly attributes the statement to its source. *Catalano v. Pechous,* 83 Ill.2d 146, 50 Ill.Dec. 242, 253, 419 N.E.2d 350, 361 (1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). The fact that the *Pantagraph* made it clear that it was reporting stories that had appeared in the *Vedomosti* therefore does not change the nature of the questions presented, in and of itself. We therefore turn immediately to the requirements for proving defamation under Illinois law.

■ The Illinois Supreme Court has adopted the definition of a defamatory communication used in the RESTATEMENT (SECOND) OF TORTS, § 559, which states that "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." See *Kolegas v. Heftel Broadcasting Corp.,* 154 Ill.2d 1, 180 Ill.Dec. 307, 312, 607 N.E.2d 201, 206 (1992). Statements may be considered defamatory *per se* or *per quod:* that is, the defamatory character may be apparent on the face of the communication, or extrinsic facts may be required to explain its defamatory meaning. *Id.* Pope relies solely on the theory of defamation *per se,* for which Illinois recognizes four distinct sub-types: (1) words that impute the commission of a criminal offense, (2) words that impute infection with a loathsome or communicable disease, (3) words that impute the inability to perform or want of integrity in the discharge of duties of office or employment, and (4) words that prejudice a party or impute a lack of ability in his trade, profession, or business. *Swick v. Liautaud,* 169 Ill.2d 504, 215 Ill.Dec. 98, 105, 662 N.E.2d 1238, 1245 (1996); *Kolegas,* 180 Ill.Dec. at 315, 607 N.E.2d at 206; *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1226 (7th Cir.1993).

■ Even if the words fall into one or more of these categories, the Illinois Supreme Court recently reiterated in Swick that "the words are not defamatory *per se* if they are reasonably capable of an innocent construction." 215 Ill.Dec. at 105, 662 N.E.2d at 1245. In making this determination, the court requires that the statement be "considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.*" *Mittelman v. Witous,* 135 Ill.2d 220, 142 Ill.Dec. 232, 238, 552 N.E.2d 973, 979 (1989), quoting *Chapski v. Copley Press,* 92 Ill.2d 344, 65 Ill.Dec. 884, 888, 442 N.E.2d 195, 199 (1982). The court is not to balance reasonable constructions, nor is it necessary to conclude that the statement *cannot* be construed in a defamatory way. *Harte v. Chicago Council of Lawyers,* 220 Ill.App.3d 255, 163 Ill.Dec. 324, 327–28, 581 N.E.2d 275, 278–79 (1st Dist.1991). In Illinois courts, the question whether a statement is reasonably susceptible to an innocent interpretation is a question of law for the court to decide. *Kolegas,* 180 Ill.Dec. at 313, 607 N.E.2d at 207. See also William L. Prosser & W. Page Keeton on Torts, § 111 at 774 (West, 5th ed.1984) ("[t]he question of whether or not the meaning of a particular communication is defamatory is one for the court").

■ A number of state law defenses are available in a defamation action, even before we approach the significant federal constitutional limitations that have accreted onto this area of the law. For a discussion of federal constitutional limitations, see generally Laurence H. Tribe, American Constitutional Law §§ 12–12, 12–13 (2d ed.1988); 4 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure, §§ 20.34 to 20.36 (West, 2d ed.1992). The Chronicle relies particularly on two of these state law defenses. First, it notes that substantial truth is a complete defense and that the plaintiff bears the burden of proving falsity. *Haynes,* 8 F.3d at 1227, 1228, citing Illinois and other cases. Implicit in this defense is the idea that publication as it stood must make the plaintiff significantly worse off than a completely or literally truthful publication would have. It is enough to show that the publication is "substantially true, or, as it is often put, to justify the 'gist,' the 'sting,' or the 'substantial truth' of the defamation." Prosser & Keeton, § 116, at 842. See also *Haynes,* 8

F.3d at 1227, 1228. Second, a statement of opinion relating to a matter of public concern that does not contain a provably false proposition is not actionable. See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 2706–07, 111 L.Ed.2d 1 (1990). The RESTATEMENT (SECOND) OF TORTS, on which as we have noted the Illinois Supreme Court has relied in the past, puts it this way in § 566: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." The important distinction is between subjective views of various kinds, on the one hand, and objectively verifiable or testable facts, on the other. See *Haynes*, 8 F.3d at 1227.

■ With these principles in mind, we turn to an analysis of the challenged portions of the *Pantagraph's* article and editorial. As noted above, Pope claimed that four aspects of the article were defamatory *per se*, relying on the third and fourth categories recognized by the Illinois courts. He begins with Paragraph 7, which stated (in full) that "[t]he articles [in *Vedomosti*] objected to the house being called 'humanitarian aid' to the struggling people of Vladimir, if in fact the house, built on prime historic land donated by Vladimir, is to further the interests of an American business." Like the district court, we find it baffling that someone might consider it defamatory to be labeled philanthropic. To the extent that this passage suggests that Pope and his company had mixed motives, it is substantially true. Indeed, before this court Pope stresses that his interest was of a business nature. Pope claims that someone could read this sentence to imply that he was not forthcoming with the people of Vladimir, but this is certainly not the only interpretation available. The reasonable interpretation suggested by the innocent construction rule is that the Russians found it difficult to accept the idea that a for-profit company might be engaged in humanitarian work—an understandable difficulty, if one recalls that Pope was working during the months and years when seventy years of Communism were crumbling, and if one further recalls that it was actually a criminal offense under the

Communist regime to engage in a for-profit business. *Cf. Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir.1993) (articles questioning the motivations behind shipment of gift packets to Desert Storm service personnel, comparing charitable and business motivations, provoked public scrutiny of plaintiff's actions and were not defamatory).

■ Pope complained that Paragraphs 16–19 of the article falsely insinuated that he misled or withheld information from Vladimir officials, and that he was heavy-handed in insisting that the project go forward on schedule. Our own reading of the relevant paragraphs reveals, to the contrary, that they furnish a substantially accurate account of the communications that took place during the spring of 1992. Paragraph 16 reports that the Vladimir side was nervous about the project and expressed concern to Pope about a lack of information on the project. Paragraph 17 reports that Pope gave general optimistic assurances, promised to cover expenses that the City could not, and warned of adverse consequences to the City's reputation if the project were to be delayed. Paragraph 18 reported that the Vladimir officials became more concerned and sent another telex to Pope. Paragraph 19 describes (without using his name) Eremeev's request for detailed information and guarantees. As a truthful account, this passage cannot be defamatory.

■ Next, Pope complains about Paragraph 28, which reported that some in Vladimir were rankled that Pope was representing himself as "some sort of benefactor" whose ideas were pouring down "as if from a cornucopia." On its face, there is plainly nothing that would damage one's reputation in this; we do not want to be the first court to find that the label "benefactor" is defamatory *per se*. Pope finds sarcasm and implicit criticism of his activities in the statement, but even if someone could read it that way, it does not make it defamatory. At most, it informed the *Pantagraph's* readers that some residents of Vladimir found charity difficult to accept. This reaction, memorialized in such famous literary characters as the March family in Louisa May Alcott's *Little Women*,

casts aspersions neither on the would-be giver nor on those who are trying to make it on their own.

▆ Last, Pope claims that Paragraph 29 of the article disparaged his reputation by reporting that "Pope's ideas always seem to cost the hosting side a pretty penny," and by implying that the December 1991 trip was a boondoggle for Pope and his "entourage" that cost Vladimir 40,000 rubles. We will assume for the sake of argument that these were inaccurate statements, both because Pope paid for the trip with the laptop computer and because the *Pantagraph* failed to indicate the dollar equivalent of 40,000 rubles. (Official statistics are hard to come by, but accounts in the press indicate that between December 1, 1991, and late January 1992, the ruble plunged from an official tourist exchange rate of 47 rubles to the dollar to something between 180 and 230 rubles to the dollar. Compare "Soviet Banks To.Set Market Rate for 'Tourist Ruble'," The Reuter Business Report, Nov. 29, 1991, with "The Ruble Is Going in a Deep Dive; Will the CIS Have Foreign Exchange?" Russian Press Digest, Jan. 28, 1992. During most of December 1991, reports indicated that the exchange rate was about 100 rubles to the dollar. See "Moscow Math: 1 Ruble = Whatever," The International Herald Tribune, Dec. 28, 1991.) Nevertheless, at worst this indicated that Pope and his associates had received a paid trip to Vladimir with some attractive side excursions to St. Petersburg and the Pokrovsky Monastery in Suzdal, at the same time he was building a valuable demonstration home in Vladimir that would eventually be given as a gift to the City (Paragraph 31). Nothing could be more ordinary in a business transaction than this kind of mixed business and pleasure trip. Looking back to the RESTATEMENT'S definition of defamation, we see nothing tending "so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." § 559.

▆ Reading the article as a whole, the reader would go away thinking that some people in Vladimir were unconvinced that this was a sensible place for the City to invest its money (however little it may have contributed), that cross-cultural misunderstandings had occurred, and that some in Vladimir resented the idea of American charity. This message easily qualifies as a statement of opinion relating to a matter of public concern. These points are not based upon objectively verifiable facts, but instead are reports about the subjective impression some people may have developed about the project. In summary, we agree with the district court that nothing in the particular paragraphs to which Pope objected nor in the article taken as a whole was actionable under Illinois defamation law.

▆ For similar reasons, we reject Pope's challenge to the editorial. Paragraph 1 of the editorial implied that Pope and/or Serendipity had kept title to the house. While not technically true, it met the test of substantial accuracy, since Serendipity is to have exclusive use and possession of the house until January 1, 2003. (The niceties of real estate title, while presumably within the ken of the *Pantagraph's* readers, were hardly likely to be familiar to the Russians, who did not even permit private ownership of real property in 1991, when the project was launched. The opening paragraph of the editorial was trying to suggest an American analogy to the Russian reaction, and it therefore used a word that approximated the terms of the Vladimir deal.) Paragraphs 2 and 3 remark that it should be no surprise that Russian newspapers raised questions about the project, because the final costs were not clear to them and they were experiencing economic uncertainties. We see nothing defamatory in the suggestion that other people want to know how much something will cost them, nor do we see problems (using the innocent construction rule) with the suggestion that communications may have been less than ideal. The telexes and Pope's numerous trips to Vladimir bear out the truth of that statement in any event. Paragraph 5 suggests that the laudable goal was "clouded" by questions about business motives: again, true, since at least Bitkina did not understand the relationship between the humanitarian and business aspects of the project and found the idea of a business motive

distasteful. Pope never denied that business motives existed, and whether or not they were the kind of thing that clouded a laudable goal fell in the realm of opinion.

 Last, Pope claimed that both the headline of the editorial and Paragraphs 7 and 8 disparaged and maligned him as an "ugly American," harming rather than helping relations between Bloomington–Normal and Vladimir. Read fairly, however, the editorial did not say that Pope was acting in the insensitive, ethnocentric fashion memorialized in William J. Lederer and Eugene Burdick's fictional work *The Ugly American* (1958). It made the quite different point that it was important to *avoid* doing anything that could be misconstrued as "ugly American" behavior, and that some of Pope's actions might have created a risk of a bad image. As such, it was an expression of opinion, not a statement implying a defamatory fact. In addition, this portion of the editorial qualified for the privilege covering fair comment and criticism on matters of public interest. See *Spelson v. CBS, Inc.,* 581 F.Supp. 1195, 1202 (N.D.Ill.1984), *aff'd,* 757 F.2d 1291 (7th Cir. 1985). As Pope himself pointed out in his brief to this Court, the "American Home" project received substantial media attention both in the United States and in Russia, including an interview with Pope conducted in Russia and broadcast nationally in the United States on National Public Radio's "All Things Considered" program of June 12, 1992, and a mid-June 1992 article disseminated by the Associated Press. It is practically inevitable that some criticism will attend this degree of national attention. The *Pantagraph* editorial was only one of a number of items in the media, many of which were favorable. In any event, for the reasons discussed above, we find that neither the article nor the editorial was defamatory.

 Pope's false light claim fails for many of the same reasons his defamation suit suffers that fate. Under Illinois law, there are three elements to such a claim: first, the allegations must show that the plaintiff was placed in a false light before the public as a result of the defendant's actions; second, the court must decide whether a trier of fact could decide that the *false* light in question

would be "highly offensive to a reasonable person"; and third, plaintiffs must allege and prove that the defendants acted with actual malice, defined in the familiar way as knowledge of falsehood or reckless disregard for whether the statements were true or false. *Kolegas,* 180 Ill.Dec. at 315–16, 607 N.E.2d at 209–10. In our view, Pope's claims do not satisfy any of these elements. Both the article and the editorial were substantially true, as reflections of some of the criticism his project had encountered in Vladimir; thus, the paper did not place him in a false light to begin with. Second, no facts in this record would support a jury finding of "highly offensive" statements, from an objective standpoint. Finally, even if the *Pantagraph* did not exhaustively check out the accuracy of Bitkina's estimate of a 40,000 ruble cost for the December 1991 trip, this does not amount to a reckless disregard for the truth. Before the article was published, Susan Pope wrote a note to the paper telling it that Bitkina's articles were "incorrect and outdated," but she never alerted it to this (or any other) specific problem. Pope's claims based on a false light theory were correctly dismissed.

We do not mean, in finding that Pope was neither defamed nor placed in a false light, to suggest that it was not frustrating to him to be criticized in the local press and, perhaps, to be misunderstood by some people in Vladimir. Like many Americans and other foreigners who have made efforts to begin relatively normal business relationships with partners in the former Soviet Union, he encountered a complex and ever-shifting situation. Suspicion, skepticism, internal rivalries among local factions, and an entirely different background for business dealings have frequently led to problems. Pope can take some comfort in the fact that the house was actually built—many others have not been so lucky, and have had to abandon projects midstream due to sudden lack of materials, licenses, reliable business partners, or interest. We hold only that the articles in the Bloomington–Normal newspaper recounting some of the cross-cultural frictions he experienced were not actionable in court. We

therefore AFFIRM the judgment of the district court.