In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3905

DANA HOLLAND,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, NANCY PIEKARSKI,
and TIMOTHY CULLINAN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cv-03255—**James B. Zagel**, *Judge.*

ARGUED JANUARY 21, 2011—DECIDED JUNE 23, 2011

Before FLAUM, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In 1993 Dana Holland was arrested and subsequently charged with sexually assaulting Dionne Stanley. Four years later, in 1997, he was convicted in Cook County Circuit Court after a bench trial. He received a stiff sentence: three consecutive 30-year terms to begin after he completed a 28-year sentence he was serving on an unrelated conviction. In

2002 new DNA testing of a vaginal swab taken from Stanley revealed a match not to Holland, but to his uncle, Gordon Bolden. In 2003 Holland's conviction was vacated. Holland subsequently sued the City of Chicago and two police officers, Timothy Cullinan and Nancy Piekarski (collectively, "the City"), in state court alleging malicious prosecution under Illinois law. When due process violations (via *Brady v. Maryland*) under 42 U.S.C. § 1983 were added to the complaint, the case was removed to federal court where summary judgment was eventually granted for the City. Holland appeals.

We start with the facts, viewed as they must be at this stage of the case, in the light most favorable to Holland. Having said that, we acknowledge that viewing the facts favorably to Holland is extraordinarily difficult because his case against the defendants rests entirely on the credibility of Stanley who has told multiple versions of her story and testified—under oath in a 2009 deposition in this case—that she committed perjury while testifying under oath in Mr. Holland's 1997 criminal court trial. Putting that little detail aside, we forge on.

On February 22, 1993, around 6:00 in the morning, officers Cullinan and Piekarski responded to a dispatch regarding a woman screaming for help. They arrived at the scene, in the alley in the 7700 block of South Paulina, in time to see a black man run from the driver's side of a car, while Stanley emerged partially clothed from the passenger's side and headed toward the officers. Cullinan chased the driver, while Piekarski stayed with Stanley and tried to calm her down. Cullinan lost sight

of the man he was chasing and returned to the police cruiser to join Piekarski and Stanley.

Stanley related what happened to the officers. Definitely not behaving like an expectant mother should (she was almost eight-months pregnant at the time) Stanley said, among other things, that she used crack-cocaine during the preceding 24 hours. She said she met a black man in a bar (at trial, she called it "a lounge") around 1:30 a.m. and that later, in his car, the man raped her and forced her to give him oral sex. She went on to add a crucial tidbit of information: the man was wearing jeans with "cartoons" on them. She also told the officers the man had a knife and dropped it in the alley.

Soon, other police officers—Mary Bonnema and Martin Tulley—arrived. Cullinan went off down the alley looking for the knife while Bonnema and Tulley tracked footprints in the snow that they thought were left by Stanley's attacker. While looking for the knife, Cullinan entered the alley behind 7821 S. Paulina (approximately one block away) where he spotted Holland standing over a trash can. Cullinan, with gun drawn, told Holland to drop the items he was holding. He did, and they fell into the trash can. The items were some empty beer bottles, an empty liquor bottle, and a pair of jeans with cartoons around the waistband. In the pocket of the jeans was Holland's wallet containing a photo ID. Cullinan took Holland back to the police cruisers to do a "show-up" with Stanley. Show-ups, unlike formal line-ups, are used, as this one was, when a suspect is brought before a victim (or vice versa) soon after the commission of an offense.

At approximately the same time, officers Bonnema and Tulley tracked the footprints to the door of 7821 S. Paulina, where Holland's grandmother lived on the first floor with his uncle Bolden, who was also the registered owner of the car that was ditched in the alley one block away. Holland sometimes stayed in the basement of the building, although the officers didn't know this at the time. Bonnema and Tulley entered the building and found no one there. However, they did find a pair of wet sneakers, which appeared to match the footprints in the snow. The sneakers were a half-size larger than Holland's shoe size.

While all this was going on, Stanley remained in the alley where the car was abandoned. According to her, just before Holland was brought back for the show-up, one of the female officers told her, "The guy you described [was] throwing out the clothes you described and we want you to take a look at him." When Holland was shown to Stanley, an officer asked her whether he was the man who attacked her, and she said, "No." Holland heard Stanley say he was not her attacker, and Officer Cullinan then took him away. According to Holland, Officer Cullinan brought him back to Stanley three more times. The first two times she said he was not the attacker. On the third presentation, she became "a little upset" and said, "No, I told you all that's not him."

Stanley had told the officers that she was drinking that night and last took drugs around noon the previous day. According to Stanley, when she said at the show-up that Holland was not the rapist, she "was pretty much

sober." Stanley also testified that after she said Holland was not the rapist, the same female officer who had told her Holland was throwing out the clothes she described added that Holland was also throwing out shoes that matched the impressions of the footprints in the snow. Stanley says the officer said, "it's him" and "[h]e ha[d] the evidence." Stanley further testified that the officer also told her that, due to the drugs and alcohol Stanley had consumed, she "was mistaken" when she said Holland was not the rapist.

Stanley also claims a female officer said, "You just have to say it's him and you'll be able to go home." One of the female officers also told Stanley she "was in good hands, [she] was safe," and that the rapist "couldn't hurt [her] any more." After that officer talked to her for approximately ten minutes, Stanley identified Holland as the rapist, saying, "That's him." Holland was arrested, and Stanley was taken to the hospital.

Stanley's story, as we have just related it, comes mostly from her 2009 deposition testimony in connection with this civil case. Her testimony during the 1997 criminal court trial was quite different. At the trial, she identified Holland as the man she met in the bar that night. She said he told her she "looked nice." After the bar closed she got into Holland's car and drove to two liquor stores in an unsuccessful attempt to buy some beer. Later, she said, he parked the car in an alley, unzipped his pants, and said, "Suck my dick, bitch." A sexual assault and a rape followed. With absolutely no hesitation, at the trial, she said Holland was the man who assaulted and

raped her. She identified the "cartoon" pants she said he was wearing. She identified a knife found in the area and said Holland pointed it at her during the assaults. She acknowledged that she first "hesitated" to identify Holland at the scene because she was afraid of him. She said the "lady officer" told her, "If that was him, I didn't have to be afraid, he couldn't hurt me anymore." After that, she identified Holland as the attacker. She said no one told her to identify Holland. She did so only because "he was the man that raped me."

At some point around the time Holland was arrested, he told the officers that it was Bolden they wanted and that it was Bolden's car in the alleyway. He also said that Bolden lived at 7821 S. Paulina and was inside. However, Bolden was not there when Bonnema and Tully entered and found the wet shoes. After Stanley identified Holland, none of the officers at the scene continued to search for Bolden.

In the days after Holland's arrest, further investigation took place. Holland claimed he'd been sleeping in his grandmother's bed after watching TV, and that Bolden was in the apartment when he woke up. He said he gathered his dirty jeans and the empty bottles and was heading down to the basement to go to bed, with a stop by the trash can in the alley to toss the bottles, when Officer Cullinan found him. He claimed that various family members could verify that he was home all night, but later none did, and in fact they gave conflicting stories to the investigators.

Although no one looked for Bolden the day of the alleged assault, the State's Attorney's Office later

located him and called him to testify before a Cook County grand jury. Bolden testified that he was not living at 7821 S. Paulina on the date of the crime; that, although he was there that night, he left between 10:30 p.m. and 11:00 p.m. and did not return until noon or 1:00 p.m. the next day; and that he did not see Holland that night after he left. The grand jury (without testimony from Stanley) indicted Holland for aggravated criminal sexual assault and related offenses.

About a year after the incident, Stanley was interviewed at the State's Attorney's Office. According to her 2009 deposition version of events, she told the interviewer that "the police" told her various things at the show-up between the time she said Holland was not the rapist and the time she said he was. She said she was told that she was drunk, high, and confused, and that Holland was throwing away jeans that matched the description she had given and shoes that matched footprints in the snow. But she also admitted that at no time during the interview, did she say that Holland was not the rapist, or that anyone told her to lie during her trial testimony. Stanley added that she could not remember the name of the person who interviewed her or whether the person was a man or a woman. Sometime after that session at the State's Attorney's Office, Stanley received a subpoena to appear in court for Holland's trial. She didn't appear, so a warrant was issued for her, and a new trial date for Holland was set.

Sometime before Holland's new trial date, Stanley moved to Milwaukee. About 30 days before the trial

date, Stanley was arrested and extradited to Chicago. The prosecutor, Assistant State's Attorney Lauren Freeman, arranged for Stanley's arrest because she failed to appear pursuant to the original subpoena.

Once back in Chicago, 13 days before Holland's trial was scheduled to start, Stanley was interviewed by Holland's attorney, George Tountas. Stanley told Tountas that Holland had raped her and that, at the show-up, she initially said he was not the rapist but later she said that he was. Tountas asked Stanley why she had initially said Holland was not the rapist, and Stanley responded that she had been "afraid to make the identification." Stanley told Tountas that the only thing the police said to her at the show-up was "not to be afraid"; they did not "sa[y] anything else to her."

Shortly before the trial, Stanley met with Freeman. Stanley's more recent account of that meeting (which is, of course, at odds with her trial testimony) is that she told Freeman that Holland did not rape her, and that she identified Bolden as the rapist from a picture Freeman showed her. Stanley also says that Freeman told her that Bolden was the "wrong guy," that "all the evidence, DNA, points to" Holland, and that Holland "has a long record for assault." According to Stanley, when that meeting occurred, she had been in jail for 30 days, and Freeman told her that if she did not testify at the trial that Holland was the rapist, she "wasn't going home," and "would be brought up on perjury charges." It is also worthwhile to note that when Stanley related this version (in 2009) of her interview with Freeman shortly

before the start of the 1997 trial she (1) knew that DNA exonerated Holland and pointed to Bolden, and (2) believed Bolden had admitted raping her. This later point was wrong: Bolden only admitted to having had *consensual* sex with Stanley on the night in question in 1993. In fact, Bolden was called to testify on Holland's behalf at the 1997 trial and he did so. He said he was the man who got out of the car and ran in 1993 after an evening of consensual sex with Stanley. Despite this testimony, Holland was convicted.

Finally, we move to issues raised on Holland's appeal of the order dismissing his case on summary judgment. Before getting to that, however, we note the obvious: Holland's conviction for a rape he did not commit was a miscarriage of justice. But it doesn't follow that just because justice miscarried, a lawsuit seeking damages will remedy the wrong. That's why many states have set up compensation systems to pay what amounts to reparations to those who, after a conviction and the service of time in prison, are exonerated. But the compensation systems in place (how much money is awarded for each year a person spent in prison for a crime he didn't commit) vary wildly from state to state. And many states do not provide benefits at all. Whether or not Mr. Holland can seek, or is seeking, compensation under the system in place in Illinois is not before us. We must, instead, confine our review to the cold truth about the viability of his claims in a court of law where to win his case, Holland must satisfy all the elements of his claims.

Holland's state law malicious prosecution case is embodied in the first two counts of his complaint. The first count names the officers, Cullinan and Piekarski; the second names the City of Chicago on a *respondeat superior* theory.

In order to prevail on a malicious prosecution claim, a plaintiff must establish "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The absence of any single element is fatal to a claim.

In this case, the police had probable cause to commence proceedings against Holland. And because his only basis for inferring malice is the absence of probable cause, he cannot prove that element either. An officer has probable cause when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed" a crime. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). To make the probable cause determination, we "step[ ] into the shoes of a reasonable person in the position of the officer." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). For purposes of a malicious prosecution claim, the pertinent time for making the probable cause determination is the time when the charging document is filed, rather than the time of the arrest. *Porter v. City of Chicago*, 912

N.E.2d 1262, 1274 (Ill. App. Ct. 2009); *but see Frye v. O'Neill*, 520 N.E.2d 1233, 1241 (Ill. App. Ct. 1988) (suggesting in dicta that probable cause at the time of arrest is the pertinent time for purposes of the tort).

Here, there was ample probable cause to commence proceedings against Holland, completely apart from Stanley's identification of him as her assailant. Specifically, there were shoe prints in the snow leading from the crime scene to Holland's residence; there were wet shoes in the house; there was no other male at the residence when police arrived; Holland was in the alley behind the residence holding jeans that matched Stanley's description of the assailant's clothing; Holland's wallet was in those same jeans; and Holland's alibi did not check out. *See e.g., Simkunas v. Tardi*, 920 F.2d 1287, 1291-92 (7th Cir. 1991). Even if Stanley had maintained that Holland was not her assailant, there would still have been probable cause. Although the police should have done a better job of investigating Bolden, they need not conduct additional investigation once they have established probable cause. *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006).

The obvious presence of probable cause proves fatal to Holland's case for another reason: he has not presented evidence of malice. As the eponymous tort suggests, malice is one of the elements of malicious prosecution. "Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. Ct. 2000). Holland is correct

that malice can be inferred when a defendant lacks proba-
ble cause and the circumstances indicate a lack of good
faith. *E.g., Aguirre v. City of Chicago*, 887 N.E.2d 656,
663 (Ill. App. Ct. 2006). But because the police had
probable cause in this case and because there is no alterna-
tive basis for establishing malice, he can establish neither
element.

Although we need not gild the lily at this point, it is
worth noting that the defendants also argue that they
enjoy state-law immunity, because a "public employee
is not liable for his act or omission in the execution or
enforcement of any law unless such act or omission
constitutes willful and wanton conduct." 745 ILCS 10/2-
202. Arguably, there is a more specific immunity pro-
vision that applies to law enforcement, which essentially
mirrors and codifies the malicious prosecution standard.
*See* 745 ILCS 10/2-208 (immunity from liability for in-
stituting or prosecuting judicial proceeding). Either
way, Holland relies on inferences based on the absence
of probable cause in order to overcome statutory im-
munity. On these facts, then, the presence of probable
cause has the opposite effect—it establishes the immunity.

We come now to Holland's second argument. He
claims that he established a triable issue of fact as to
whether the officers (more Piekarski, the female officer,
than Cullinan) withheld exculpatory evidence from him
in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The
argument is addressed in less than two pages (a dozen
pages of argument are devoted to the malicious prosecu-
tion claim) at the tail end of Holland's brief on appeal.

It is well established that *Brady* requires that material exculpatory evidence, unavailable to the defense but known to the prosecution, must be disclosed. The duty to disclose includes exculpatory evidence in the form of impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1999). And police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors and the withholding of evidence is "material." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Bagley*, 473 U.S. at 676).

The *Brady* issue here revolves around the identification of Holland by Stanley soon after the police received her report that she had been sexually assaulted. For want of a better phrase, the procedure is, as we noted earlier, referred to as a "show-up." Show-ups have some advantages: little time has passed since the criminal act, so the victim gets a look-see while the events are still quite fresh; if no identification is made, the "suspect" is usually set free quickly. But there are drawbacks as well: as with eyewitness identifications in general, the risk of a misidentification during a show-up is always present.

Holland claims that his due process rights under *Brady* were violated during his 1997 trial because, in effect, "the police" (again, probably the female officer, Piekarski) failed to disclose the "pressure" they put on Stanley to identify him as her attacker during the show-up. There are several problems with this argument.

A defendant in a criminal case that actually goes to trial has the "responsibility to probe the witnesses and investigate their versions of the relevant events." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Holland testified at his deposition in this civil case that he was presented to Stanley three times during the show-up and that each time he heard her say he was *not* her assailant. Accordingly, one would think that the first thought to pop into the mind of an attorney defending Holland would be to ask this question: What (if anything) happened between the three times Stanley said Holland was not the rapist and the time she finally said that he was? Holland's lawyer (Tountas) actually asked that question of Stanley in an interview before the 1997 trial, and she told him that she didn't immediately ID Holland at the show-up because she was "afraid." She didn't tell him that any pressure, undue or otherwise, was applied to her. Even if she was lying when she said that to Attorney Tountas, there is no evidence that either officers Piekarski or Cullinan (the only defendants on the *Brady* claim) coerced Stanley to lie or were otherwise withholding exculpatory evidence on this point from the defense.

In addition, *Brady* is not violated unless "the result of the proceeding would have been different" had the suppressed evidence been disclosed. *Id.* In other words, a *Brady* violation must be material. The mere possibility that an item of evidence may have helped a defendant during his trial on criminal charges does not establish materiality. See *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997). Here, Holland waived his right to a

jury trial and elected to be tried instead by the court. Assume, for a moment, that the trial judge heard testimony that Officer Piekarski had urged, coaxed, or pressured Stanley to ID Holland as her attacker during the show-up. Would that have moved the judge to find Holland not guilty? We do not think so, especially when Stanley explained in live testimony at the trial that she initially hesitated to make an identification because she was "afraid" of Holland. That explanation, coupled with some fairly strong physical evidence—particularly the rather unique "cartoon" design on the jeans Holland was holding in the alley one block away—would have resolved any doubt about Holland's guilt in the state's favor.

Finally, the length of time a victim has to observe a defendant is always an important ingredient in sizing up eyewitness identification. A 30-second encounter with a purse snatcher is one thing. A lengthy encounter—here Stanley was with her attacker for almost five hours, and their encounter started off as friendly (recall that Stanley testified that she agreed to spend time with the attacker after he flattered her by saying that she "looked nice") is quite another thing. For these reasons, the district court correctly granted summary judgment to Piekarski and Cullinan on the *Brady* claim.

The judgment of the district court is AFFIRMED.