In the
United States Court of Appeals
For the Seventh Circuit

No. 13-2675

HANOVER INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

NORTHERN BUILDING COMPANY and
THOMAS VANDUINEN,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-02020 — **Elaine E. Bucklo**, *Judge.*

ARGUED DECEMBER 13, 2013 — DECIDED MAY 8, 2014

Before EASTERBROOK, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* This is a breach of contract action brought before us pursuant to our diversity jurisdiction. In 2008, Northern Building Company ("Northern"), operated by Thomas VanDuinen out of his home in Alpena, Michigan, won a contract to do various work at Midway International Airport

in Chicago under the supervision of a project manager. Hanover Insurance Company ("Hanover") served as Northern's bonding agent for the project, issuing surety bonds on Northern's behalf. In exchange, Hanover required Northern to enter into an Indemnity Agreement ("the Agreement") outlining Northern's obligations with respect to any claims asserted against those bonds.

After a dispute arose between the project manager, Northern, and two of Northern's subcontractors, claims were asserted against the bonds issued by Hanover. Hanover resolved those claims in a manner explicitly permitted by the Agreement, a salient fact which Northern's attorney conceded at oral argument. Hanover sought indemnity from Northern, which was also explicitly permitted by the Agreement, but Northern refused to cooperate. Hanover brought a breach of contract action in the Northern District of Illinois, hoping to compel Northern to do what it was clearly obligated to do. The parties filed cross-motions for summary judgment, and Hanover's was granted. Northern appeals. The Agreement is unambiguous. Northern breached it, and Hanover is entitled to contractual damages. We affirm.

## I.   BACKGROUND

At all relevant times, Northern, operated by Thomas VanDuinen, was in the business of performing general contracting services related to public construction projects. State and federal law required Northern[1] to obtain surety bonds for

---

[1]   We will occasionally use "Northern" to refer to both Northern and
(continued...)

such projects to secure both Northern's performance of the work and its payment of any amounts owed to subcontractors and suppliers. Hanover was Northern's bonding agent. In consideration for its issuance of the surety bonds, Hanover required Northern to enter into an Indemnity Agreement, which VanDuinen signed in his individual capacity and in his capacity as President of Northern.

The Midway International Airport Project ("the Project") was financed by the Federal Aviation Association ("FAA") and managed by Parsons Infrastructure & Technology Group, Incorporated ("Parsons"). In 2008, Northern won the bid for the Project, and began contracting with various subcontractors to perform the work required. Not long thereafter, things went awry. Beginning in 2009, certain subcontractors hired to upgrade the fire alarm systems at Midway—McDaniel Fire Systems ("McDaniel") and Rex Electric—began to complain that Northern had failed to pay them in accordance with the surety bonds and contract documents for the Project. The dispute between Northern and its subcontractors meant that the work was halted, which led to a separate complaint, from Parsons, that Northern was failing to complete the Project as required. The FAA opted to retain possession of the remaining contract funds, totaling $127,086.00, pending resolution of the various disputes and completion of the work required.

Ultimately, Hanover received two types of claims against the surety bonds: (1) claims for payment from subcontractors

---

[1] (...continued)
VanDuinen, as their interests are identical for our purposes.

McDaniel (for $127,452.78) and Rex Electric (for $78,495.00)[2] and (2) a claim for performance from the project manager, Parsons. Hanover demanded collateral from Northern, as was its right under the Agreement. Northern refused to post collateral or to indemnify Hanover in any respect. Hanover hired counsel to assist with investigating the claims against the bonds and with enforcing the Agreement against Northern.

On September 9, 2009, McDaniel filed for bankruptcy relief in the Northern District of Indiana. On March 2, 2010, the bankruptcy trustee brought suit against Hanover seeking the amount McDaniel claimed it was owed for work already performed. On September 22, 2012, Hanover paid the bankruptcy trustee $127,452.78 to resolve both McDaniels's and Rex Electric's payment claims against the bond.

Around the same time, Hanover agreed to resolve Parson's bond claim for performance by stepping into Northern's previous role as general contractor and arranging for completion of the Project. In exchange, in July 2011, Parsons paid Hanover the $127,086.00 of contract funds the FAA had withheld from Northern due to the failure of Northern and its subcontractors to complete the Project.

In March 2011, Hanover filed this lawsuit against Northern and VanDuinen to force compliance with the Agreement. Specifically, Hanover sought to settle its right to the $127,086.00 of contract funds initially withheld by the

---

[2]   Rex Electric was a subcontractor to McDaniel, whose own payment therefore depended on (and would be drawn from) Northern's payment to McDaniel.

FAA—Northern still believed it had a right to payment of those funds—and to recoup attorney fees and costs incurred in resolving the performance and payment claims against the bonds.[3] The district court granted summary judgment in Hanover's favor. Northern and VanDuinen appeal.

## II.  ANALYSIS

We begin by briefly discussing Northern's challenge to the district court's subject matter jurisdiction. Northern believes that the money Hanover was eventually paid for completing the Project by Parsons and the FAA—totaling $127,086.00—was never genuinely "in controversy" and therefore cannot be counted towards the $75,000.00 threshold for diversity jurisdiction. *See* 28 U.S.C. § 1332(a). That argument is nonsense. It does not matter whether Hanover knew at the time of filing that it would be able to gain *possession* of those funds through settlement. What matters is that Hanover still had to settle the legal question of its *right* to possess, or its ownership of, those funds. Under the original contract for the Project, the funds were slated to go to Northern, and Northern still appears to believe it should have been paid. Both parties claimed the money; Hanover sued to establish that the money rightfully belonged to it. That amount was therefore "in controversy," regardless of whether it would actually change hands before final judgment was entered.[4]

---

[3] The fee amount claimed increased throughout the course of this litigation, ultimately totaling $76,016.69 as of the district court's entry of judgment.

[4] Nor would it defeat subject matter jurisdiction for Northern to concede,

(continued...)

Substantively, Northern's appeal asks us to review the district court's grant of summary judgment, a task which we undertake *de novo*. *Swetlik v. Crawford*, 738 F.3d 818, 826 (7th Cir. 2013). Summary judgment is proper where the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A "material fact" is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. On the other hand, where the factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Contract cases such as this one are often prime candidates for summary judgment because contract interpretation is a question of law. *SAMS Hotel Grp., LLC v. Environs, Inc.*, 716 F.3d 432, 434 (7th Cir. 2013).

---

[4] (...continued)

now, that the money belongs to Hanover. That might be a good way for Northern to lose the case, but it would not be a good reason why the district court could not hear the case in the first place, given that the money would still have been in controversy at the time of filing.

Northern has tried to make this into a multi-issue, complex proceeding. But it is actually very simple. Only a few basic observations need to be made. First, the Agreement in this case is clear and unambiguous in all relevant aspects. Northern clearly breached it; Hanover did not. Second, Northern's arguments against the enforceability of the Agreement are unsupported and unpersuasive. Third, Northern's argument against the fee award is meritless and reflects a lack of understanding of the summary judgment mechanism. We will work through each of these points in turn, ultimately affirming the judgment of the district court.

A. *Hanover's Conduct was Entirely Consistent with the Agreement.*

Since this case involves a breach of contract claim, we must begin by determining what the Agreement itself requires of Hanover and Northern. In diversity cases, we apply federal procedural and state substantive law. *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 380 (7th Cir. 2001). Rules of contract interpretation are substantive, so the Agreement must be interpreted according to state law — in this case, the laws of the State of Illinois. *Id*. In Illinois, the main objective in contract interpretation is to give effect to the intent of the parties. *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999). "If a contract is clear and unambiguous, the court must determine the intent of the parties solely from the plain language of the contract." *Id*. A review of the plain language of the contract in this case shows not only that the contract language is clear and unambiguous, but that Hanover complied with it and Northern did not.

We begin by observing that it is undisputed that Hanover received claims against the surety bonds it issued on Northern's behalf. McDaniel and Rex Electric made claims for payment, and Parsons made a claim for performance. Once Hanover received the claims, it asked Northern to post collateral in an amount certain to cover the payment claims by the subcontractors. That was in keeping with the plain language of the Agreement:

2.  The Indemnitors shall exonerate, indemnity, save harmless the Surety from and against every claim, demand, liability, cost, charge, suit, judgment and expense which the Surety may pay or incur, including, but not limited to, loss, interest, court costs and consultant and attorney's fees[.]

*   *   *

3.  Payment shall be made to the Surety by the Indemnitors *as soon as liability* exists or *is asserted against the Surety, whether or not the Surety shall have made any payment therefor.* Such payment to the Surety shall be: a) if the amount asserted as a claim, demand or suit is an ascertainable or liquidated amount, the amount of the claim, demand or suit asserted against the bond or bonds by any claimant or obligee, plus the amount the Surety deems sufficient, in its sole discretion, to indemnify and hold it harmless from and against any loss, cost, interest, and expense necessary to defend, investigate, or adjust the claim, demand or suit[.]

(emphasis added.) But Northern—the Indemnitor—refused to comply with the Agreement it signed. That is a breach.

So, Hanover took matters into its own hands, and resolved the payment claims against the bond by settling with McDaniel and Rex Electric for a monetary payout. That was in keeping with the plain language of the Agreement, as well:

> The Surety shall have exclusive right to adjust, settle, or compromise any claim, demand, suit or any other proceeding arising out of any bond against the Surety and/or the Indemnitors, take whatever action it deems appropriate in response thereto, and its determination of whether to defend or settle the same shall be binding and conclusive upon the Indemnitors.

With the monetary claims resolved, Hanover settled Parsons's bond claim for performance by stepping into Northern's shoes and arranging for the completion of the Project. That, too, was in keeping with the plain language of the Agreement:

> In the event the Indemnitors, or any one or more of them, shall: (a) whether actually or allegedly (as de-clared by the obligee or owner), delay, abandon, forfeit or breach any contract secured by a bond, or (b) fail, neglect or refuse in any manner to timely pay for any labor or material used in the prosecution of any contract secured by a bond, or (c) change its character identity, control, beneficial ownership, or existence, or (d) fail to perform, or comply with any of the terms, covenants, or obligations of this Agreement, including the appoint-ment of a receiver or trustee whether such Indemnitor(s) is/are insolvent or not … then the Surety,

> in its sole discretion, shall have the right, but not the obligation, to take possession of the work under the contract and any other contract, in connection with which the Surety has issued a bond or bond(s) and, at the expense of the Indemnitors, to complete, to arrange for completion, or to agree to the re-letting or completion by the obligee or owner of the contract work.

Finally, having resolved all claims against the bond in exactly the manner contemplated by the Agreement, Hanover turned to recouping its costs from Northern, the recalcitrant Indemnitor. This, of course, was also in keeping with the plain language of the Agreement:

> In the event of any payment or disbursement by the Surety, the Indemnitors agree to immediately reimburse the Surety for any and all payments and disbursement made (including but not limited to, interest from the date of the Surety's payments at the maximum rate allowable) under the Surety's belief that liability for the payment existed or that payment was necessary or expedient, whether or not such liability, necessity or expediency existed. Vouchers or other evidence of payment by the Surety shall be conclusive evidence of the fact and amount of such liability, necessity, or expediency and of the Indemnitors' liability to the Surety therefor.

Northern still refuses to comply, which obviously constitutes an additional breach. Thus, the core of the case is very simple. Hanover and Northern entered into the Agreement. Hanover adhered to the Agreement, and Northern refused to indemnify

Hanover as it was required to do, or to cover fees and costs, as it was also required to do. Again, that is breach. That should have been the end of it.

Northern's only argument against breach is based on a fundamental (and unreasonable) misreading of the Agreement. Northern believes that its own indemnification duties, and Hanover's powers to investigate and settle any claims, could not be triggered unless Northern was actually found conclusively liable for a breach of the accompanying surety bonds. That reading has no basis whatsoever in the text of the Agreement. The plain language says that it is the *claim* against the surety bonds, not the existence of any actual liability on Northern's part, that triggers those rights and responsibilities. There can be no genuine dispute that claims were made. There is nothing for a jury to do, and summary judgment was appropriate.

### B. Attacks on Enforceability

Northern, of course, still does not want to pay what it owes. Toward that end, its brief includes a pair of attacks on the enforceability of the Agreement. Northern argues that the Agreement was unconscionable,[5] and in the alternative that it was unenforceable because Hanover acted in bad faith. But Northern has made no legal or factual showing to support either contention. We do not find Northern's cursory defenses against enforceability persuasive.

---

[5]  This argument appears in Northern's statement of the issues, but we cannot find it thoroughly developed anytime thereafter.

Whether a contract is unconscionable is a question of law to be decided by the court, not a jury. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 458 (5th Cir. 2005); *see also Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996) ("The fixing of the boundary between questions of law and questions of fact, is a matter of federal procedural law and therefore governed by federal rather than state law in diversity as in other federal suits."). We review such questions of law *de novo. Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1081 (7th Cir. 2013). In Illinois, a contract is procedurally unconscionable if an impropriety in the process of forming the contract deprived a party of a meaningful choice. *Kinkel v. Cingular Wireless, LLC*, 857 N.E.2d 250, 264–65 (Ill. 2006) (citations omitted). On the other hand, a contract is substantively unconscionable when a clause or term in the contract is totally one-sided or harsh. *Bishop v. We Care Hair Dev. Corp.*, 738 N.E.2d 610, 621 (Ill. App. Ct. 2000).

A contract or a clause within a contract may be unenforceable for either reason, but Northern has given us nothing to work with. Northern repeatedly alleges that the Agreement was "unfair"—suggesting substantive unconscionability—on the grounds that Hanover stands to profit from it at Northern's expense without any wrongdoing on Northern's part. That simply is not true. Hanover has not profited one cent. Putting aside the practical cost of the time and effort Northern has forced Hanover to pour into what should have been an open-and-shut case, the money Hanover obtained from Parsons and the FAA did not even cover the money Hanover paid out to McDaniel and Rex Electric. The remainder of Hanover's recovery goes to outside counsel fees and costs. Where is the profit? In any case, there is nothing substantively unconsciona-

ble, or even unusual, about an indemnity agreement that operates in this way. *See Lamp, Inc. v. Int'l Fid. Ins. Co.*, 493 N.E.2d 146, 149 (Ill. App. Ct. 1986) (collecting cases in which a surety's "right to settle" is triggered by the existence of a claim against that surety, not by the establishment of actual liability).

As for bad faith, Northern has presented no evidence at all. It appears that Northern's bad faith argument is based on the same misunderstanding of the Agreement as Northern's "defense" against breach: Northern thinks Hanover's powers and rights under the agreement were tethered to the existence of actual liability for a breach of the bonds (and that Hanover's invocation of those powers on something less than established liability was therefore an act in bad faith). But they were not. Hanover did exactly what it was empowered to by the Agreement. We cannot call that bad faith. *Northern Trust Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995) ("Parties to a contract … are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract.").

### C. Fees and Costs

Northern's final argument pertains to the amount of attorneys' fees awarded to Hanover by the district court. We begin by noting that the Agreement clearly and unambiguously permitted recovery of all of the types of fees claimed by Hanover. The indemnity provisions specifically covered attorneys' fees incurred:

(a) by having executed or procured the execution of the bonds; or

(b) in making an independent investigation of any claim, demand, or suit; or

(c) in defending any suit, action, mediation, arbitration or any other proceeding to obtain release from liability whether the Surety, in its sole discretion, elects to employ its own attorney or permits or requires Indemnitors to defend the Surety; or

(d) in enforcing any of the covenants, terms and conditions of this Agreement.

Nonetheless, Northern argues against the award on two grounds: first, that the district court did not gather sufficient evidence (such as itemized bills) to make a fee determination; and second, that a jury determination was necessary because the fees here are a part of Hanover's contractual damages, not the result of statutory fee-shifting or some other mechanism traditionally determined by the judge alone.

Northern is correct as to the second point. The fees here *are* part of Hanover's legal damages. But that does not guarantee a jury proceeding or even a bench proceeding. Legal damages, like liability, can be determined via the summary judgment mechanism. "If all the material issues of fact underlying a claim, including the amount of damages, are established and on the basis of applicable substantive law the claimant is entitled to judgment, a summary judgment including the award of damages may be appropriately rendered." *Sahagian v. Dickey*, 827 F.2d 90, 100 n. 8 (7th Cir. 1987) (quoting 6 Moore's Federal Practice ¶ 56.17[18] (2d ed. 1986)).

Hanover evidenced its contractual damages with a sworn affidavit from inside counsel stating the amount billed by outside counsel, Hinshaw & Culbertson. Once Hanover did that, Northern had to come forward with more than just an ethereal suspicion that the number was too high. *Vukadinovich v. Bd. of Sch. Trs. of North Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) ("The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion," and "[t]he nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'"). Northern introduced no evidence whatsoever to contradict Hanover's figure. There is no issue of fact, here, let alone a genuine issue. Summary judgment on the issue of fees was warranted.

Northern's first argument, that a more detailed evidentiary showing was necessary to support a fee award, is not applicable. The cases Northern cites requiring a more detailed foundation for a fee award come from the fee-shifting context, in which the fee determination is a proceeding supplemental to the district court's entry of a judgment, carried out within the district court's discretion. *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558–559 (2010). This context is different. The district court in this case was never calculating a "fee award." It asked only whether there was a genuine factual dispute as to the amount of Hanover's legal damages under the Agreement. In the absence of any contrary evidence, an affidavit from a Hanover legal officer stating the amount Hanover had been billed by its attorneys was sufficient. Our closing advice to Northern is to carefully consider how much

longer it is wise to drag this case out. Hanover's attorney expenses are only going to increase.

### III.   CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.