In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1377

SHIRLENA BARNES,

*Plaintiff-Appellant,*

*v.*

CITY OF CENTRALIA, ILLINOIS, and MICHAEL PEEBLES,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:17-cv-01366-NJR-RJD—**Nancy J. Rosenstengel**, *Judge.*

ARGUED SEPTEMBER 10, 2019 — DECIDED NOVEMBER 26, 2019

Before WOOD, *Chief Judge*, and KANNE and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. While arresting gang members in Centralia, Illinois, police officer Michael Peebles felt intimidated when Shirlena Barnes, a city resident with gang connections, drove up and yelled derogatory epithets. Later, Barnes posted statements on social media that Peebles believed threatened him and his family. As a private citizen, Peebles submitted a complaint to the police department and

participated no further. After a police investigation, Barnes was arrested, and a criminal prosecution followed. The state later dismissed the charges, and Barnes sued Peebles and the City of Centralia asserting her civil rights were violated. The district court granted summary judgment to the officer and the city, which we affirm.

## I. BACKGROUND

We review de novo the district court's grant of summary judgment, drawing our own legal and factual conclusions from the record. *Tapley v. Chambers*, 840 F.3d 370, 376 (7th Cir. 2016). We construe all facts and reasonable inferences in the nonmovant Barnes's favor. *Id.* (citing *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772 (7th Cir. 2012)).

A gang named the "Rude Boyz" is well known in the City of Centralia in downstate Illinois. Two of its members threatened a twelve-year-old boy who witnessed a gang-related shooting in a park. The threats were investigated by Peebles, who over the years has arrested many of the Rude Boyz and became the "go-to guy" in the Centralia police department for intelligence on the gang. Peebles and Centralia Police Sergeant Jamie James found and arrested the two gang members on open warrants for weapons and other charges.

As the officers took the two into custody, Barnes drove by the scene. According to Peebles, Barnes parked her car across the street and yelled "bald motherf*****" and "thirsty."[1] In a witness statement given later that day, Peebles identified Barnes as yelling the epithets at him. In later deposition

---

[1] Per Barnes's counsel at oral argument and references in discovery, "thirsty" means overzealous or overaggressive in arresting individuals.

testimony, Peebles admitted he could not identify exactly who was yelling. He concluded the insults were directed at him because he was the only bald individual there.

James was present at the arrests and did not recall specifically what Barnes yelled. He believed Barnes was angry and that she tried to intimidate Peebles into not arresting the two gang members. Barnes later denied yelling at the arrest scene and said she was speaking with a relative in another vehicle.

Law enforcement knew that Barnes had connections with the gang. Barnes and Peebles were familiar with each other through police contacts with several of Barnes's family members. Officers understood that the Rude Boyz used Barnes's home as a safehouse. Video of the park shooting shows Barnes's daughter retrieving the suspect's bicycle. Before the arrests, Barnes complained about Peebles to city authorities. According to Barnes, she did not know if, at the time of the arrests, any of her family members were involved in gang activity. She also said she did not know the two Rude Boyz whom Peebles and James arrested.

The evening of the arrests, Barnes posted on Facebook: "This thirsty b**** Mike out here on the same on [sic] bulls***." After someone responded to her post, Barnes posted a second time: "But this b**** don't believe that what goes around come[s] around and when you got kids of your own."

A secretary at the Centralia police department saw the posts and texted Peebles who was at home. Peebles felt, based on earlier attempts by the gang at intimidation, that these were credible threats against him and his family, so he called Assistant State's Attorney Melissa Doran. The prosecutor told Peebles she could not tell him what to do but that he could file

a report like a private citizen if he desired. Peebles then called Sergeant James about the Facebook posts and the conversation with Doran. He told James he felt Barnes had threatened his family.

Sergeant James dispatched another officer to Peebles's house to take a written voluntary statement. Peebles said Barnes was at the scene of the arrest of known gang members and yelled "bald head motherf*****" at him. Peebles also relayed the content of Barnes's Facebook posts, his belief that his "kids and family" were threatened, and his desire "to make sure nothing happens to [his] family."

James also texted the assistant state's attorney:

> Sgt. James: Hey Melissa, its [J.] [J]ames. I talked with [Peebles] and just wanted to clarify before we acted. You want us to arrest her after 9 but no offense report just a vague pc [probable cause] sheet?

> Prosecutor Doran: Pretty much. That will give me a chance to talk to Matt about it before he decided right away what to do with the case[.] However, as I told [Peebles], I can't tell you guys that you should or should not arrest anyone. That discretion lies solely with you. As the statute re: intimidation of a public official is written this is a debatable case since it isn't clear to me whether this was a specific unique threat of harm vs a generalized threat of harm (as the statute reads). As always however, what may not be able to be proven beyond a reasonable

doubt still may have probable cause since it is a
much lower burden.

Based on Barnes's association with the Rude Boyz and the content of her posts, James concluded Barnes had credibly threatened Peebles and his family. James testified that he believed the Rude Boyz had "put out a hit" on Peebles, and he also witnessed Barnes's behavior at the arrests. Given this, James decided to arrest Barnes for intimidation. He concluded this decision was within his sole discretion. After the arrest, the Marion County State's Attorney charged Barnes with intimidation and aggravated intimidation. *See* 720 ILCS 5/12-6; 720 ILCS 5/12-6.2. Three months later the state stopped pursuing those charges and Barnes's prosecution ended.[2]

As a result of Barnes's arrest and prosecution, she sued Peebles for unlawful seizure and malicious prosecution under 42 U.S.C. § 1983 and Illinois state law. She also claimed the City of Centralia, under *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), was civilly liable for an express policy or widespread practice that motivated her arrest and prosecution.

The parties engaged in discovery, including several depositions. Peebles and James testified Peebles made his complaint against Barnes as a private citizen. Peebles said his only role in the arrest and prosecution was as the complaining witness providing a voluntary statement. He did not know what crimes Barnes was eventually charged with and was never

---

[2] The handwritten *nolle prosequi* (refuse to pursue) motion by prosecutor Doran states "[d]ue to the Court's recent ruling in the *People v. Reichenbach* preliminary hearing, the People are electing not to proceed at this time."

contacted by the assistant state's attorney after the case was filed. Peebles also said that when he made his statement he was seeking to get Barnes arrested and prosecuted. Barnes admitted she wrote the Facebook posts about Peebles but said she did not intend that Peebles see them. Per Barnes, her statement about "what goes around comes around" referred to "karma" and that you should treat other people's kids the way you want yours to be treated.

The defendants moved for summary judgment on all of Barnes's claims, which the district court granted.

## II. DISCUSSION

Summary judgment is appropriate when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing FED. R. CIV. P. 56(c)). For Barnes's § 1983 claims to survive summary judgment, she must present sufficient evidence of a genuine issue of material fact that a constitutional deprivation occurred. *Homoky v. Ogden*, 816 F.3d 448, 452 (7th Cir. 2016).

### A. Under Color of State Law

A law enforcement officer can be liable under § 1983 if the officer deprives the plaintiff of a federally guaranteed right while acting "under color of state law." *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010). "Action is taken under color of state law 'when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id*. (quoting *Honaker v. Smith*, 256 F.3d 477, 484–85 (7th Cir. 2001)). Not every action by a state official or employee occurs under color

of state law. *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). "A state officer's conduct does not constitute acting under color of state law unless it is 'related in some way to the performance of the duties of the state office.'" *Wilson*, 624 F.3d at 392 (quoting *Honaker*, 262 F.3d at 485). "Section 1983 does not cover disputes between private citizens, even if one happens to be an officer." *Plaats v. Barthelemy*, 641 F. App'x 624, 627 (7th Cir. 2016).

Although Peebles is a police officer, and the interaction with Barnes which led to her arrest occurred during Peebles's employment, Peebles complained about Barnes's yelling and Facebook posts as a private citizen, not as an investigating officer. The circumstances surrounding Barnes's arrest and prosecution confirm Peebles's role was limited to that of a complaining witness. A different officer took Peebles's statement. Peebles did not arrest Barnes and had no role in her arrest. James had sole discretion to decide whether to arrest Barnes, and Peebles did not know if Barnes would be arrested. James also witnessed some of Peebles's allegations because James was present when the two gang members were arrested. Based on this evidence James concluded probable cause existed that Barnes had committed the crime of intimidation. James's text message with the prosecutor shows she was not directing James to arrest Barnes. Further, Peebles did not know what crimes the state would charge Barnes with, if any. And during the prosecution, the assistant state's attorney did not contact Peebles. All of this confirms Peebles acted as a private citizen complaining about a purported crime, distinct and apart from his job as police officer.

No evidence supported Barnes's allegation that Peebles acted under color of state law when Peebles claimed Barnes

had threatened him. *See, e.g.*, *Gibson v. City of Chicago*, 910 F.2d 1510, 1516 (7th Cir. 1990) ("[A] mere assertion that one is a state officer does not necessarily mean that one acts under color of state law."). Peebles reported an alleged crime. This was a private act that did not involve any exercise of state authority. Law enforcement officers, like all other citizens, may invoke the state's protection without rendering themselves liable under § 1983. *See Mauntel v. Briscoe*, 1995 WL 319646, at *1 (N.D. Ill. 1995) (citing *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975)) (holding police officer was not acting under color of state law when he called the station to report assault and the department knew he was a police officer). Indeed, in her deposition Barnes admitted Peebles's complaint was private.

Barnes argues the statements she made at the arrest of the gang members were constitutionally protected and thus cannot be used to establish probable cause of a crime. This argument misses the mark because Barnes's protests connected her to Peebles (the only bald officer at the arrests) and to her later social media posts, a fact she admitted toward the end of her deposition. She also contends repeatedly that "a reasonable jury may conclude" alternative outcomes based on the facts discovered. None of these scenarios contains evidence that Peebles was anything other than a private citizen or that his police duties related to Barnes's claims. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (noting "some metaphysical doubt as to the material facts" does not defeat summary judgment motion).

With no evidence Peebles acted under color of state law in his role as a witness in Barnes's arrest and prosecution, Barnes cannot prove Peebles violated Barnes's Fourth Amendment

rights against unlawful seizure and malicious prosecution under § 1983.

### B. *Alleged* **Monell** *Violation*

Barnes also alleges the City of Centralia, through its police department, should be liable as a result of Peebles's actions. Because a municipality cannot be held liable under § 1983 on a theory of respondeat superior, *Monell*, 436 U.S. at 694, a plaintiff must identify a municipal "custom, policy or practice that effectively caused or condoned the alleged constitutional violations." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012).

In the district court, Barnes based her *Monell* claim on the city's alleged failure to discipline officers who unlawfully seize others and purportedly cover up unlawful seizures. The district court granted defendants summary judgment on that claim, concluding Barnes had failed to offer admissible evidence in support of her assertions. On appeal, Barnes alters her theory, arguing the city failed to train and supervise its officers, which caused her alleged constitutional violation.

Barnes's new theory of liability under *Monell* meets the same fate as her previous one. First, by failing to argue this theory in the district court, she has waived it on appeal. *See Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) (citations omitted). "[T]o reverse the district court on grounds not presented to it would undermine the essential function of the district court." *Id.* (quoting *Boyers v. Texaco Ref. & Mktg., Inc.*, 848 F.2d 809, 812 (7th Cir. 1988)) (internal quotation marks omitted).

Second, Barnes has not identified any evidence that supports her new theory of liability. While Barnes has cited cases

in the failure to train and failure to supervise contexts, she has neither referenced nor even alluded to any evidence to support *Monell* liability based on her new theory. *Monell* claims require evidence, but Barnes has offered none. *See Jenkins v. Bartlett*, 487 F.3d 482, 491–93 (7th Cir. 2007) (noting municipality may not be held liable under *Monell* for failure to adequately train or supervise officers when plaintiff fails to demonstrate any constitutional violation by municipal employee).

Barnes's sole contention on this topic is that Centralia failed to train its officers in handling profanity and that her profanity was the cause of her arrest. But Barnes submits no evidence in support of this claim, much less evidence that a failure to train or supervise was "the moving force" behind Peebles reporting her or James arresting her. *See Monell*, 436 U.S. at 694 (referencing "official policy as the moving force of the constitutional violation"). So Barnes's *Monell* claim against Centralia fails.

### C.     *Illinois Malicious Prosecution Claim*

Finally, Barnes claims that Peebles instituted legal proceedings against her, violating Illinois's law against malicious prosecution. To prevail on such a claim, a plaintiff must demonstrate: (1) the commencement or continuance by the defendant of an original judicial proceeding against the plaintiff; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) malice; and (5) damages. *Grundhoefer v. Sorin*, 20 N.E.3d 775, 780 (Ill. App. Ct. 2014). Illinois courts have long recognized that suits for malicious prosecution are not favored because persons acting in good faith should not be deterred from reporting crimes by the fear of unfounded suits. *See, e.g., Beaman*

*v. Freesmeyer*, 131 N.E.3d 488, ¶ 24 (Ill. 2019); *Joiner v. Benton Comm. Bank*, 411 N.E.2d 229, 231 (Ill. 1980).

Under its supplemental jurisdiction, the district court concluded probable cause existed that Barnes committed a crime. Because the third element (absence of probable cause) could not be satisfied, the court granted Peebles summary judgment on this claim. We need not reach the question of probable cause, though, because we see two flaws with Barnes's claim: she has not shown malice (the fourth element) or termination of the criminal case in her favor (the second element).

First, to show malice, Barnes must prove the prosecution was initiated for a reason other than to bring Barnes to justice. *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011). In her summary judgment response, Barnes asserted "her arrest was a result of malice of Defendant Peebles." On appeal, she states: "Peebles was doing more than merely relaying facts to the Centralia police department [and] that he was acting with malice." That is all Barnes claims regarding Peebles's alleged malice. And Barnes cites no evidence in support of these bare assertions, notwithstanding opportunity to do so. Barnes "does not address the other officers, nor does [she] offer any details about why [she] believes [Peebles] acted maliciously." *Jackson v. Village of Grayslake*, 2016 WL 8731441, *5 (N.D. Ill. Sept. 9, 2016). Unsupported recitation of the elements without actual evidence cannot survive a motion for summary judgment. *See, e.g.*, *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994).

Second, Barnes failed to show why the case was terminated in her favor.[3] In her response to defendants' summary judgment motion, Barnes argued the second element was satisfied because defendants "admit the charges against Plaintiff were dismissed." But dismissal is not the requirement; rather, Barnes must show termination of the proceeding in her favor "for reasons that indicate [her] innocence." *Filimoniuk v. Nilles*, 2019 WL 2510355, at *5 (Ill. App. Ct. June 14, 2019) (citing *Ferguson v. City of Chicago*, 820 N.E.2d 455, 461 (Ill. 2004)); *see also Joiner*, 411 N.E.2d at 232 ("It is clear that the settled law bars a malicious prosecution action predicated upon criminal proceedings which were terminated in a manner not indicative of the innocence of the accused.").

Here, the *nolle prosequi* order did not reflect the specific reasons for its entry. The order merely stated: "Due to the Court's recent ruling in the *People v. Reichenbach* preliminary hearing, the People are electing not to proceed at this time." The record does not reveal the nature of the ruling, or how the *Reichenbach* case might relate to Barnes. The order also does not indicate the case was dismissed with prejudice such that the State of Illinois will not pursue the charge in the future. *See Filimoniuk*, 2019 WL 2510355, at *5 (noting an "order dismissing the case without prejudice removes the case from the docket, but allows the person who filed it to refile the charges within the applicable statute of limitations period"). While the *nolle prosequi* order ended the prosecution, it was not

---

[3] While the parties did not address this issue on appeal, we elect to address it for the sake of completeness. *See, e.g.*, *Wallace v. Baldwin*, 895 F.3d 481, 485 (7th Cir. 2018).

indicative of Barnes's innocence or that the case had terminated in her favor.

Barnes has not submitted evidence as to why the prosecutor entered the *nolle prosequi* order. Given this, "we cannot presume that the charges were dismissed without prejudice because plaintiff was innocent." *Id.* Because the "bare use of the *nolle prosequi* order, which did not state its reasons for its entry, did not establish that the criminal proceedings were terminated in a manner consistent with [Barnes's] innocence," this claim fails. *Swick v. Liautaud*, 662 N.E.2d 1238, 1243 (Ill. 1996) (clarifying a plaintiff's burden of proof in a malicious prosecution action to require evidence of termination in a manner consistent with plaintiff's innocence).

### III. CONCLUSION

For these reasons, we AFFIRM the grant of summary judgment to the defendants.