**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230067-U

Order filed November 19, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| SARAH BAXTER and MICHAEL BAXTER, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiffs-Appellants, | ) | Du Page County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| JENNIFER DUNN, M.D.; AUDREY | ) | |
| BROMBERGER, M.D.; DU PAGE HEALTH | ) | |
| SPECIALISTS, S.C.; DU PAGE HEALTH | ) | |
| SPECIALISTS 2, LLC; ADVOCATE | ) | |
| HEALTH AND HOSPITALS | ) | Appeal No. 3-23-0067 |
| CORPORATION, individually and d/b/a | ) | Circuit No. 18-L-1337 |
| ADVOCATE GOOD SAMARITAN | ) | |
| HOSPITAL; and ADVOCATE GOOD | ) | |
| SAMARITAN HOSPITAL; | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Jennifer Dunn, M.D. and Du Page Health | ) | |
| Specialists, S.C., | ) | The Honorable |
| | ) | Angelo J. Kappas, |
| Defendants-Appellees). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Peterson and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:    The circuit court did not err when it denied a motion *in limine* that sought to prohibit a witness' habit testimony. Further, the plaintiffs' arguments regarding the defendants' alleged violations of Illinois Supreme Court Rule 213 are without merit.

¶ 2     The plaintiffs, Sarah and Michael Baxter, filed a medical-negligence action against the defendants, Jennifer Dunn, M.D., Audrey Bromberger, M.D., Du Page Health Specialists, S.C., Du Page Health Specialists 2, LLC, Advocate Health and Hospitals Corporation, and Advocate Good Samaritan Hospital, alleging, among other things, that Dr. Dunn negligently repaired a fourth-degree tear of the perineum that Sarah suffered during childbirth. After a trial, the jury found in favor of the defendants. On appeal, the plaintiffs argue that (1) the circuit court erred when it denied their motion *in limine* 26 regarding Dr. Dunn's habit testimony and (2) they are entitled to a new trial due to the defendants' violations of Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018). We affirm.

¶ 3                               I. BACKGROUND

¶ 4     Sarah gave birth to a daughter on July 9, 2012, at 1:21 p.m. Dr. Dunn provided prenatal care to Sarah and delivered the baby. As a result of the birth, Sarah suffered perineal tearing. Dr. Dunn performed a repair of the tear immediately after delivering the baby.

¶ 5     Subsequently, Sarah endured perineal discomfort and pain, as well as a loss of bowel control and painful sexual intercourse. She had two additional surgeries to address the issues, but she continued to suffer from the same symptoms.

¶ 6     In November 2018, Sarah and her husband, Michael, filed a medical-negligence action against the defendants. In part, the complaint alleged that Dr. Dunn negligently diagnosed Sarah's perineal tear as a third-degree tear, when it actually was a fourth-degree tear. The complaint further alleged that Dr. Dunn failed to adequately repair Sarah's perineal tear.

¶ 7      Dr. Dunn was deposed in December 2016. She testified that she graduated from medical school in 1998 and did her obstetrics-and-gynecology residency at Advocate Illinois Masonic Medical Center in Chicago from 1998 to 2004. Dr. Dunn stated that she learned about the recognition and management of perineal tears occurring in childbirth when she was in medical school. She defined first-, second-, third-, and fourth-degree perineal tears.

¶ 8      From 2004 to 2006, she worked at Northwest Associates for Women's Healthcare and then from 2006 to the present at Du Page Health Specialists.

¶ 9      Regarding Dr. Dunn's experience with repairing perineal tears, the following exchange took place between Dr. Dunn and the plaintiffs' attorney during the deposition:

"Q. Okay, and, Doctor, if I haven't asked you this question but is it fair to say that you also learned how to repair third- and fourth-degree obstetrical perineal tears in medical school?

A. No.

Q. No. Where, if anything, did you learn how to repair them?

A. In residency.

Q. Okay, and in residency that would be at Illinois Masonic, correct?

A. Yes.

Q. Do you recall, going back to your residency, when you would have actually had the hands-on experience to start repairing perineal obstetric tears?

A. My very first day.

Q. Okay, and as a first-year resident would you be able to actually do the suturing or are you there more for observation or is it a gradual increase in –

A. It's a gradual increase in responsibility.

3

Q. Okay, and over your years, your four years in residency, do you recall how many third-degree perineal lacerations you would have repaired?

A. No, I do not.

Q. Okay, and what about fourth-degree perineal lacerations, do you know how many of those you would have repaired in the four years?

A. No, I do not.

Q. Okay, for the four years on a third-degree perineal tear, would it have been less than 30 over the four years?

A. I don't know.

[Defense counsel]: Objection, asked and answered. She said she didn't know.

Q. How about fourth-degree, would that have been less than 30 over the four years?

A. I do not recall."

¶ 10 Additionally, Dr. Dunn was asked about how many third- and fourth-degree perineal tears she had repaired while at Northwest Associates. She answered that she had performed those types of repairs, but she did not know how many she had performed. She answered similarly in response to questions about her time with Du Page Health Specialists.

¶ 11 On the day Sarah gave birth, July 9, 2012, Dr. Dunn arrived at Sarah's bedside at 1:10 p.m. The baby was delivered at 1:21 p.m. The placenta was delivered at 1:26 p.m., after which time Dr. Dunn began the perineal-tear repair.

¶ 12 Dr. Dunn testified regarding the vaginal-delivery note she filled out on the date of Sarah's delivery. The note "[e]xplain[ed] what transpired throughout the vaginal delivery from delivery of the infant to repair." The note stated, among other things, that Sarah had a third-degree perineal tear and that Dr. Dunn repaired it. She confirmed that there are three different categories of third-

4

degree tears (A, B, and C) and that she neither wrote in the note which category Sarah had nor could she currently recall the category of Sarah's tear. She agreed that knowing the category was important because that information dictated how the tear would be repaired.

¶ 13 The following exchange took place regarding the time the note was filled out:

"Q. And, Doctor, you filled out the vaginal delivery note at 1:30 p.m., is that correct?

A. That's the time I put on there, yes.

Q. Okay, and at that time then the surgical repair would have been finished, is that correct?

A. Yes."

¶ 14 Dr. Dunn denied that the repair required an operative report. In doing so, she stated, "I repair my third-degree tears in the same manner I always repair them. There is no standard of care to document how a third degree was done, but by my training I repair all of mine the same way." She added that the American College of Obstetricians and Gynecologists recommends completing an operative report for fourth-degree tears.

¶ 15 Among other things, Dr. Dunn also stated in her deposition that fecal incontinence, perineal pain, and sexual dysfunction can persist even when a perineal tear has been repaired properly. She also detailed the process she uses for third-degree perineal tears of the most severe category (3C), which included specific descriptions of the surgical tools used. Additionally, she denied that Sarah had a fourth-degree perineal tear, as there was no communication between the rectum and the vagina.

¶ 16 The plaintiffs filed numerous motions *in limine* but only one is relevant for the purposes of this appeal. Motion *in limine* 26 sought to bar Dr. Dunn and the defendants' witnesses from

5

testifying about Dr. Dunn's habit of repairing third- and fourth-degree perineal tears. More specifically, the plaintiffs alleged that no proper foundation could be laid for the testimony. The plaintiffs highlighted the following from Dr. Dunn's deposition: (1) beyond knowing that Sarah had a third-degree tear, Dr. Dunn did not know the extent of the tear; (2) there was no documentation of the details of the surgical repair; and (3) Dr. Dunn did not know how many surgical repairs of third- and fourth-degree tears that she had performed. The plaintiffs also emphasized that because she had been designated as a controlled expert witness pursuant to Rule 213(f)(3) (Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018)), Dr. Dunn's trial testimony was necessarily limited by her deposition testimony under Rule 213(g) (Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018)).

¶ 17    The circuit court addressed the plaintiffs' motions *in limine* at a hearing in July 2022. During the hearing, the circuit court stated the following:

"I read carefully the dep of Dr. Dunn, and the examination of Ms. Schaffrick did -- part of the problem is she wasn't completely boxed out. I don't know if she's going to say when she says I don't know, if that was completely capped out with, well, do you know if you did more than 10, do you know if you did more than a hundred, do you know if you did more than 500, I don't know. That wasn't really examined thoroughly."

¶ 18    Later, when it specifically addressed motion *in limine* 26, the court added, "[t]here's a reason why attorneys always ask those types of questions when you get an 'I don't know' answer, is to box it out for this specific reason. They weren't boxed out." On that stated basis, the court denied the plaintiffs' motion *in limine* 26.

¶ 19    During the jury trial, Dr. Dunn, who did not recall the undocumented details of her repair of Sarah's perineal tear, testified extensively regarding perineal tears in general. Among other things, she testified that based on literature and clinical experience, 50-70% of vaginal deliveries

6

result in perineal tears. Approximately 7-11% of those tears are third-degree tears. Approximately 25% of those third-degree tears do not heal properly after repair and 20% may become infected. Additionally, 20-30% of women that had third-degree perineal repairs end up needing a second surgical repair. Then, Dr. Dunn stated, "[a]nd of those women, some will recover, but there will be some who will not recover from that."

¶ 20    Dr. Dunn was also asked how many third- and fourth-degree perineal tears she had repaired in her career, to which she said she did not know. She was then asked if she could "tell us on average how often you repair either a third degree laceration or fourth degree laceration starting with residency through your career --," at which point counsel for the plaintiffs objected, stating, "213, basis of opinion." The objection was overruled and Dr. Dunn gave estimates on the numbers: (1) anywhere from 15-20 per year during her four years of residency; and (2) anywhere from 10-15 per year for the first ten years of practice. Thus, she estimated that she had performed 180-200 repairs of third- and fourth-degree perineal tears by the time she repaired Sarah's tear. Dr. Dunn also provided detailed testimony about the manner in which she repaired third-degree perineal tears.

¶ 21    Dr. Dunn was also questioned regarding the time it took to repair third-degree tears. She stated that it was not possible to perform the repair within four minutes. In fact, they typically took her 20 minutes to complete. She further stated that vaginal-delivery notes contain only general information on the events of a delivery. She does not fill out the form until after she has completed the delivery, made any repairs, changed out of her "delivery guard," and washed her hands. She did not write notes while still in a delivery room.

¶ 22    Next, she stated that vaginal-delivery notes were not reliable sources of information for determining the time it took to complete a perineal-tear repair. Counsel for the plaintiffs objected

7

to the testimony, claiming that it was an undisclosed opinion that contradicted her deposition testimony. In denying the objection, the circuit court stated that in her deposition, Dr. Dunn only agreed that 1:30 p.m. was the time she wrote on the note. The court added:

> "I think the way the question and answer was phrased, again, this goes similar to the custom and practice argument, it's not boxed out completely to know exactly what that meant. We know her opinion is -- and it's in the deposition that she couldn't have done it in four minutes, and I think this is explaining a little bit about that."

¶ 23    Dr. Dunn also testified regarding a "surgical count sheet," which was used to keep track of surgical instruments and other related products. The sheet, which was filled out by a technician, noted that the delivery table setup was recorded at 1:20 p.m., Dr. Dunn requested sutures at 1:30 p.m., and that the final count took place at 1:40 p.m. after the perineal-tear repair was complete.

¶ 24    A timeline containing notes of the delivery event as recorded by a registered nurse was admitted into evidence and Dr. Dunn was asked questions regarding the timeline. In particular, the timeline had multiple listings for 1:30 p.m., including that Sarah was pushing but also that "pericare" had been completed. Dr. Dunn pointed out that those listings were inconsistent, as pericare would not be given while Sarah was still pushing.

¶ 25    Dr. Dunn testified that these and other records that were admitted into evidence contain inconsistent times regarding the events transpiring during Sarah's delivery. They also contained no information regarding the details of the repair, including how long it took.

¶ 26    On cross-examination, Dr. Dunn admitted that she did not document whether Sarah's tear was a 3A, 3B, or 3C. However, she clarified that at the time of Sarah's tear, the 3A, 3B, and 3C distinctions did not exist.

¶ 27     Several other witnesses testified at trial, including experts for both sides. The plaintiffs called Dr. Jon Hathaway, an obstetrics and gynecology physician, and Dr. Ralph Silverman, a colorectal surgeon, both of whom testified that they reviewed the materials from the case and that Dr. Dunn both misdiagnosed the degree of Sarah's tear and failed to comply with the standard of care. The defense called Dr. David Ondrula, a colorectal surgeon, and Dr. Marc Feldstein, a practicing obstetrician and gynecologist. Both doctors testified, among other things, that they reviewed the materials from the case and concluded that Sarah had suffered a third-degree perineal tear and that Dr. Dunn complied with the standard of care.

¶ 28     The jury returned a verdict in favor of the defendants. After the plaintiffs' posttrial motion was denied, they appealed.

¶ 29                                   II. ANALYSIS

¶ 30                        A. DENIAL OF MOTION *IN LIMINE* 26

¶ 31     The plaintiffs' first argument on appeal is that the circuit court erred when it denied their motion *in limine* 26 regarding Dr. Dunn's habit testimony.

¶ 32     The decision of whether to grant a motion *in limine* will not be disturbed on appeal unless the circuit court's decision constituted an abuse of discretion. *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 33     It is important to place the plaintiffs' argument in its proper context before we decide the issue. Habit evidence is unquestionably admissible at trial if it is relevant and a proper foundation is established. *Alvarado v. Goepp*, 278 Ill. App. 3d 494, 496 (1996). Illinois Rule of Evidence 406 provides:

9

"Evidence of a habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Ill. R. Evid. 406 (eff. Jan. 1, 2011).

The plaintiffs' argument attacks the foundation presented for Dr. Dunn's habit testimony at trial. Specifically, they argue that Dr. Dunn should have been limited to testifying in accord with her deposition testimony that she could not recall how many third- and fourth-degree perineal tears she had repaired. Thus, the plaintiffs' argument actually implicates Illinois Supreme Court Rule 213(g), which states, in relevant part, that "[t]he information disclosed in *** a discovery deposition[] limits the testimony that can be given by a witness on direct examination at trial." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018).

¶ 34        In this case, Dr. Dunn stated in her deposition that she did not know how many third- and fourth-degree perineal tears she had performed throughout her residency and her subsequent employment. However, the only specificity in the questioning by counsel for the plaintiffs pertained to Dr. Dunn's time as a resident—whether she had performed less than 30 third- or fourth-degree perineal-tear repairs during those four years. Dr. Dunn answered that she could not recall the number. When counsel for the plaintiffs asked Dr. Dunn how many repairs she had performed in her post-residency employment, there was no attempt to get a sense of how many repairs she had performed.

¶ 35        As the circuit court noted:

"I read carefully the dep of Dr. Dunn, and the examination of Ms. Schaffrick did -- part of the problem is she wasn't completely boxed out. I don't know if she's going to say when she says I don't know, if that was completely capped out with, well, do you know if you

10

did more than 10, do you know if you did more than a hundred, do you know if you did more than 500, I don't know. That wasn't really examined thoroughly."

The court later added that "[t]here's a reason why attorneys always ask those types of questions when you get an 'I don't know' answer, is to box it out for this specific reason. They weren't boxed out."

¶ 36 There is no dispute that Dr. Dunn had performed perineal-tear repairs prior to repairing Sarah's tear. Now, the plaintiffs seek to hold the circuit court accountable for their attorney's lack of specificity in asking related questions. The plaintiffs point to no authority in which a Rule 213 violation was found in such circumstances. In fact, the two cases cited by the plaintiffs are inapposite, as *Fakes v. Eloy*, 2014 IL App (4th) 121100, and *White v. Garlock Sealing Technologies, LLC*, 373 Ill. App. 3d 309 (2007), both address situations in which undisclosed, contradictory expert opinions were used at trial. In *Fakes*, the expert stated in his deposition that the decedent's death was caused by her bleeding esophageal varices, but at trial, he testified that he was unsure what caused the decedent's death. *Fakes*, 2014 IL App (4th) 121100, ¶¶ 67. In *White*, the expert stated through interrogatory responses that he could not opine whether the decedent had asbestosis, but he opined at trial that the decedent in fact did not have asbestosis. *White*, 373 Ill. App. 3d at 312-14. The instant case does not involve an undisclosed, contrary expert opinion like *Fakes* and *White*. It involves only the number of perineal-tear repairs Dr. Dunn had completed over the course of her career. *Fakes* and *White* provide no guidance for the instant case's vastly different factual scenario.

¶ 37 We note that the plaintiffs also claim that Dr. Dunn should not have been allowed to testify about how many third- and fourth-degree perineal tears she had repaired in her career because the defense had a duty to supplement her deposition answers pursuant to Rule 213(i), which requires

11

a party "to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party" (Ill. S. Ct. R 213(i) (eff. Jan. 1, 2018)).

¶ 38        To properly preserve an alleged error for appellate review, a party must make a timely objection. *In re Estate of Doyle*, 362 Ill. App. 3d 293, 303 (2005). Significantly, "[a] specific objection only preserves the ground specified." *Id.* Our review of the record in this case reveals that the objection counsel for the plaintiffs made at trial regarding Dr. Dunn's updated numbers was "213, basis of opinion." That objection was based not on Rule 213(i), but rather on Rule 213(f)(3), which requires, among other things, a party to identify "the conclusions and opinions of the witness and the bases therefor." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). Thus, counsel for the plaintiffs did not object to the testimony under Rule 213(i). Under these circumstances, the plaintiffs have forfeited their Rule 213(i)-based argument. See *Doyle*, 362 Ill. App. 3d at 303.

¶ 39        The plaintiffs also assert that the circuit court erred when it allowed defense experts Drs. Feldstein and Ondrula to testify regarding Dr. Dunn's habit of repairing third- and fourth-degree perineal tears. However, the plaintiffs do not explain where or how Drs. Feldstein and Ondrula testified to Dr. Dunn's habitual practice. In fact, the only reference the plaintiffs make to the doctors' testimony in this regard is from their depositions, in which both doctors were asked about how much experience Dr. Dunn had with repairing third- and fourth-degree perineal tears. Both doctors stated that they did not know how much experience she had. That testimony does not support the plaintiffs' claim. We find the plaintiffs' sub-argument to be forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2018).

¶ 40        Under the circumstances of this case, we find no abuse of discretion in the circuit court's decision to allow Dr. Dunn to testify as to the estimated number of perineal-tear repairs she had

12

performed throughout her career. Accordingly, we hold that the circuit court did not err when it denied the plaintiffs' motion *in limine* 26.

¶ 41                                    B. RULE 213 VIOLATIONS

¶ 42       The plaintiffs' second argument on appeal is that they are entitled to a new trial due to defendants' violations of Supreme Court Rule 213. The plaintiffs assert three such violations; we will address these allegations in turn.

¶ 43       "The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of discretion." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004).

¶ 44       First, the plaintiffs argue that the circuit court improperly allowed Dr. Feldstein to testify to a "new basis for his opinion" that, based on a particular photograph (plaintiffs' exhibit 17) of Sarah's perineum, Sarah did not suffer a fourth-degree perineal tear.

¶ 45       Significantly, the plaintiffs admit that in arriving at his opinion, Dr. Feldstein disclosed that he reviewed all of the plaintiffs' photographs. The problem, the plaintiffs assert, is that Dr. Feldstein did not disclose any specific photograph upon which he relied. However, the plaintiffs do not cite to any authority requiring an expert to explicitly list a particular photograph or photographs from the ones reviewed as the basis for the expert's opinion. Thus, the plaintiffs have forfeited this argument for review. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring citation to authority for arguments raised in an appellant's brief).

¶ 46       Second, the plaintiffs argue that the circuit court improperly allowed Dr. Dunn to testify that the vaginal-delivery note was not a reliable source as to how long it took her to repair Sarah's perineal tear. This argument is based on the plaintiffs' claim that Dr. Dunn testified in her deposition that it took her only four minutes to complete the repair the tear.

13

¶ 47        The plaintiffs' argument misconstrues Dr. Dunn's deposition testimony. The following exchange took place during Dr. Dunn's deposition regarding the time written on the vaginal-delivery note:

> "Q. And, Doctor, you filled out the vaginal delivery note at 1:30 p.m., is that correct?
>
> A. That's the time I put on there, yes.
>
> Q. Okay, and at that time then the surgical repair would have been finished, is that correct?
>
> A. Yes."

Dr. Dunn did not testify that the repair took only four minutes. She admitted only that the time written onto the note was 1:30 p.m., which the circuit court noted and considered when it denied the plaintiffs' objection to Dr. Dunn's testimony regarding the time it took her to repair Sarah's tear. We find no abuse of discretion in the circuit court's decision.

¶ 48        Moreover, we note that the plaintiffs were in possession of several documents indicating that the times written onto the vaginal-delivery note were not reliable, including the registered nurse's notes that pushing was still occurring at 1:30 p.m. but that "pericare" had also been completed by that time. Thus, it is without merit for the plaintiffs to claim they were surprised by Dr. Dunn's trial testimony that she did not complete the repair in four minutes.

¶ 49        For the same reasons, we further hold that the plaintiffs' third Rule 213-based argument—that the circuit court improperly allowed Dr. Feldstein to testify that the vaginal-delivery note was not a reliable source as to how long it took Dr. Dunn to repair Sarah's perineal tear—also fails.

¶ 50        We are mindful of the serious physical and emotional consequences that Sarah's injury has caused her and her family. However, Illinois law does not support the relief the plaintiffs have

14

requested in this appeal. Under the circumstances of this case, we hold that the circuit court's decision must be affirmed.

¶ 51                                III. CONCLUSION

¶ 52        The judgment of the circuit court of Du Page County is affirmed.

¶ 53        Affirmed.